UNITED STATES of America,

and

**U.S. District Court Western District of New York, Appellee,**

v.

**Darnyl PARKER, Defendant–Appellant.**

**Docket No. 04–5175–CR.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 12, 2005.

Decided: Feb. 21, 2006.

*See also* 108 Fed.Appx. 676.

84

Carol E. Heckman (Amy L. Hemenway, on the brief), Harter Secrest & Emery LLP, Buffalo, New York, for Appellee.

Mark J. Mahoney, Harrington & Mahoney, Buffalo, New York, for Appellant.

Before: WALKER, Chief Judge, WESLEY and HALL, Circuit Judges.

WESLEY, Circuit Judge.

The Sixth Amendment of the United States Constitution guarantees that anyone accused of a crime "shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. That guarantee is not limited to those who through hard work, good fortune or other means are able to retain and pay counsel of their choosing. *Gideon v. Wainwright*, 372 U.S. 335, 344–45, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). The assistance of counsel is, and must be, available to anyone accused of a crime, for without counsel the accused stands alone against the power and resources of the State, with no one to speak for him, no one to ensure that the criminal law and its processes are not bent to the will of public approbation.

This case calls us to examine a rarely-visited corner of the post-*Gideon* legal landscape. Defendant Darnyl Parker raises two complaints—each touches tangentially on his right to counsel. The first concern calls into question the procedural and substantive guidelines for the mid-case appointment of assigned counsel under the Criminal Justice Act ("CJA" or the "Act"), 18 U.S.C. § 3006A(c). Parker requested CJA appointment on the eve of trial after his retained counsel expended substantial efforts on his behalf. The second, and related concern, questions a practice in the United States District Court for the West-

ern District of New York ("Western District" or "W.D.N.Y.") of judicial inquiry of retained counsel at an early stage of the proceeding. The Western District's practice seeks an assurance that counsel has been "fully retained" for the duration of the proceedings as a prerequisite to counsel's approved appearance on behalf of the accused.

The two questions are related in that defendant contends that the Western District's "fully retained" requirement impairs his statutory and constitutional rights to obtain publicly funded assigned counsel when his funds have been exhausted and his retained attorney is left with no source of compensation. Despite the widespread use of publicly funded counsel in courtrooms throughout the country, precious few judicial inquiries address the applicable legal principles. After reviewing the relevant statutes and constitutional precedents, we reject defendant's contentions that the district court improperly denied his initial mid-case request for publicly funded counsel and that the Western District's "fully retained" practice violates his statutory and constitutional rights to appointed counsel. We affirm.

## BACKGROUND

As a result of a drug-related sting by the Federal Bureau of Investigation in late 1999 and early 2000, the government filed a criminal complaint against four police officers from the City of Buffalo including Detective Darnyl Parker. At Parker's initial appearance on March 16, 2000, attorney Mark Mahoney indicated to Magistrate Judge Leslie G. Foschio that he was "fully retained" as Parker's counsel for the duration of the proceedings. Judge Foschio asked Mahoney: "you're here to rep-

resent that you're fully retained to represent the defendant Darnyl Parker in this matter?" After noting that Parker had not yet been indicted, Mahoney answered: "Yes, I'm retained." Mahoney added that, assuming there is an indictment, "I am confident that I will be his attorney at that time." Judge Foschio confirmed: "So you're saying that you are fully retained ... for the duration of these proceedings." Mahoney responded in mid-sentence: "Yes, Judge." On April 4, 2000, the government filed a twelve-count indictment against six defendants, including Parker.[1]

Parker initially indicated to Mahoney that he wanted to pursue a plea agreement. Although the magistrate judge's "fully retained" inquiry contained no temporal limits on the scope of Mahoney's commitment to Parker, Mahoney apparently accepted the case in the belief that Mahoney wanted to negotiate a plea. At the time of his arrest, Parker had only $10,000 to secure a criminal defense attorney. In addition to this $10,000 retainer, Parker and his mother agreed to pay Mahoney $1,000 per month toward the costs of representation. According to Mahoney, Parker would never have been able to afford a retainer for trial representation. In Mahoney's view, in light of the significant jurisdictional and substantive issues raised in pre-trial motions, the retainer was only "marginally adequate" if a plea was entered at some point relatively early in the proceedings.

After extensive pre-trial litigation, Parker's circumstances changed significantly. First, instead of seeking a plea, Parker decided to proceed to trial. Second, Parker paid Mahoney an additional $33,000 by prematurely liquidating his retirement

---

1. In addition to Parker and his fellow officers, the indictment named William Parker (Parker's son) and Reno Sayles, both of whom pled guilty before trial and later testified for the government.

fund. Third, in a bail revocation hearing on December 20, 2001, the court found that Parker had violated the conditions of his pretrial release by attempting to tamper with a witness. It ordered Parker detained pending trial, and Parker remained in custody for the duration of the proceedings. Consequently, the Buffalo Police Department suspended Parker without pay as of January 2, 2002.

On January 8, 2002, just prior to the commencement of trial,[2] Parker moved, *ex parte* and under seal, to have Mahoney appointed as counsel pursuant to 18 U.S.C. § 3006A(c).[3] Parker's motion for mid-case appointment under § 3006A(c) was supported by an affidavit from Mahoney, as well as a CJA Form 23 from Parker. CJA Form 23, a standard financial affidavit, requires "comprehensive financial data, including employment income of the defendant and his or her spouse; all other income, cash, and property; identification of the defendant's dependents; and all obligations, debts, and monthly bills." *In re Boston Herald, Inc.*, 321 F.3d 174, 177 (1st Cir.2003). In his financial affidavit, Parker indicated that, although he had previously received $1,400 per week in gross salary, he had been suspended without pay from the Buffalo Police Department. He also claimed that he had no other income, additional savings, or assets except a house valued at $15,000 and an automobile valued

at $2,500. Finally, in addition to $2,000 in credit card debt, Parker indicated that he had two dependent daughters for whom he paid $800 per month in child support that was automatically deducted from his gross salary.

In an Order issued January 25, 2002, Chief Judge Richard Arcara, quoting *United States v. Herbawi*, 913 F.Supp. 170, 172 (W.D.N.Y.1996), indicated that defendant's motion for mid-case appointment of CJA counsel would fail unless defendant demonstrated "sufficiently unusual and extenuating" circumstances to justify the appointment of counsel who had been fully retained. The court concluded, however, that it did not have enough information to decide defendant's motion. It directed Parker to provide: (1) a copy of the retainer agreement; (2) a statement (in the form of an affidavit) indicating the amount and date of all payments Parker made to Mahoney; (3) the age of each dependant claimed on Parker's financial affidavit; and (4) a copy of Parker's 2000 and 2001 tax returns.

Parker responded only with a memorandum of law and an affirmation from Mahoney. The district court later noted that the absence of an affidavit from Parker was significant because Mahoney had made statements in the CJA application that were either inaccurate or contradicted

---

2. The trial lasted ten weeks and resulted in Parker's conviction on ten counts. His conviction and sentence were the subject of a separate appeal in this Court. *See United States v. Ferby*, 99 Fed.Appx. 285, 2004 WL 1147087 (2d Cir. May 19, 2004) (unpublished opinion), *amended and superseded by*, 2004 WL 1950418 (2d Cir. Sept.3, 2004). Mahoney represented Parker in the underlying appeal and raised a number of issues regarding, *inter alia*, the validity of the district court's evidentiary rulings, the appropriateness of the jury instructions, the sufficiency of the evidence, and the accuracy of Parker's sentence. On March 25, 2005, this Court remanded the

case to the district court (where the case is currently pending) for resentencing in light of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir.2005).

3. Parker also moved for the payment of services other than counsel pursuant to 18 U.S.C. § 3006A(e). The district court later rejected that claim because "these expenses were clearly foreseeable and should have been incurred long before defendant Parker was detained." Parker does not challenge that determination on this appeal.

statements in Parker's financial affidavit. The court also indicated that it was "perplexed" because the information contained in Mahoney's affirmation was seemingly based on Parker's personal knowledge.

On March 4, 2002, the district court articulated three reasons for denying the appointment of CJA counsel. *See* J.A. Vol. I, A69–73 (*"Parker I "*). First, the district court noted that Mahoney still had not provided the court with the information necessary to rule on Parker's application. Specifically, Mahoney failed to provide the court with (1) a copy of the retainer agreement (because "apparently none exists"); (2) a sworn statement indicating the amount and date of all payments Parker made to Mahoney; (3) the ages of Parker's named dependants; and (4) the requested tax returns.[4]

Second, the district court held that, in light of the court's discovery that Parker was still receiving his full salary, Parker was not financially eligible for CJA appointment. On January 31, 2002, the Buffalo Police Department reinstated Parker, even though he was incarcerated, in order to fire him for failing to report for duty. As a result of the termination, Parker received a number of pay checks for accrued vacation time, as well as a "longevity" payment based on his years of service to the department. Indeed, after hearing the February 26, 2002 testimony of Cap-

tain Mark Morgan of the Buffalo Police Department, the court determined that Parker would continue to receive his regular pay checks until April 12, 2002.

Third, the district court denied CJA appointment because it concluded that, although the trial was still ongoing, Parker had paid Mahoney a significant amount of money for his legal services. The court noted that Parker paid with an understanding that Mahoney would represent him throughout the proceedings. Indeed, the court reminded Mahoney that he had represented to the magistrate judge that he was "fully retained." The district court concluded that, in any event, the amount already given to Mahoney is "sufficient to ensure that counsel will be able to adequately represent the defendant throughout the duration of this trial." In a footnote, the court mentioned the possibility of appointing CJA counsel after Parker received his final paycheck.

On March 14, 2002, while the jury was deliberating and one day before its verdict, Parker moved for reconsideration of the district court's March 4, 2002 Order.[5] On May 20, 2002, the district court denied the motion. However, the court appointed Mahoney as CJA counsel retroactively to April 12, 2002—the date Parker no longer received checks from the Buffalo Police Department. The district court concluded

---

4. Mahoney claims that his affirmation was sufficiently responsive to the court's request for additional information from Parker. In that memorandum, Mahoney incorporated by reference his description of his financial arrangements with Parker and Parker's previous payments. He also identified Parker's named dependents (although he did not provide their ages until a later submission) and argued that Parker's tax returns could not be provided for Fifth Amendment reasons. Mahoney also asserts that, although the district court failed to recognize it, Parker's subsequent submissions, including those attached

to Parker's motion for reconsideration, cured any remaining omissions or inconsistencies.

5. Mahoney attached an affidavit containing additional information regarding the earlier omissions and later submitted two supplemental affirmations. Parker and Parker's mother also submitted supporting affidavits. Parker admitted in his affidavit that he and Mahoney had "never signed a written retainer agreement" but emphasized that "I began in this case planning to take a plea, and I know Mr. Mahoney relied on this in accepting me as a client."

that, "without his salary, Parker is no longer able to afford counsel within the meaning of the CJA." [6] Parker appealed.

In addition to disputing the district court's eligibility determination, Parker challenged the W.D.N.Y.'s practice of requiring an assurance at the initial appearance that defense counsel is "fully retained" for the course of the criminal proceeding. In reviewing Parker's appeal, we noted that, "[u]nfortunately, nowhere in the record is the nature or scope of such a Western District practice set forth for our review." *United States v. Parker*, 92 Fed.Appx. 26, 2004 WL 569275, at *1 (2d Cir. Mar.23, 2004) ("*Parker II*") (unpublished opinion). As a result, "without intimating any view on the merits of defendant's arguments or the practices of the Western District," we vacated the district court's order denying Parker CJA relief and remanded for the district court to consider "the compatibility of Western District custom and practice with the requirements of the CJA." *Id.* at *2.[7]

On remand, the district court concluded (i) that Parker was financially ineligible for CJA appointment prior to April 12, 2002, (ii) that Mahoney received a reasonable fee for the work he performed, and (iii) that the W.D.N.Y.'s practice of inquiring whether an attorney has been "fully retained" for the entire proceeding is compatible with the CJA. *See United States v. Parker*, 2004 WL 2095684 (W.D.N.Y.

Sept.14, 2004) ("*Parker III*") (unpublished opinion).

The district court noted that the "threshold issue" was "whether Parker was 'financially unable to pay counsel' at the time that his application was made on January 8, 2002," *id.* at *6 (quoting 18 U.S.C. § 3006A(c)), and that, "[a]lthough Parker was initially suspended without pay on January 2, 2002, he was reinstated as of January 31st and continued to receive his full salary" until April 12, 2002, *id.* The court pointed out that pay records for the period between January 4, 2002, and April 12, 2002, indicated that Parker received a check every two weeks, yielding a gross income for the period of approximately $12,836.25 and a net income of approximately $5,460.09. *Id.* at *6 & nn. 8–9. Accordingly, the court concluded that Parker failed to establish that he was financially eligible for CJA appointment before April 12th because "Parker's net income of over $5,000 during this 14–week period should have been sufficient to pay counsel even after his necessities were satisfied." *Id.* at *7.

The district court also concluded that Mahoney received a reasonable fee for the work he had performed. *See id.* at *7–8. Thus, "[e]ven if the [c]ourt had found that Parker was financially eligible for CJA appointment before April 12, 2002, the application still would have been denied." *Id.* at *7. The court noted that Mahoney had received $71,973.52 ($52,225.00 from Parker for pre-trial work and $19,748.52

---

**6.** Mahoney remained as CJA trial counsel from April 12, 2002, through Parker's sentencing on August, 20, 2002. Chief Judge Arcara, recognizing Mahoney's extensive work on this case, later waived the presumptive statutory maximum, 18 U.S.C. § 3006A(d)(2)—at that time, $5,200—and approved Mahoney's CJA voucher of $19,748.52 for his post-trial work.

**7.** This Court also suggested that the Western District "appoint *pro bono* counsel to represent the interests of the [d]istrict [c]ourt and to represent it in any later appeal." *Parker II*, 92 Fed.Appx. 26, 2004 WL 569275, at *2. On May 11, 2004, the district court appointed *pro bono* counsel for itself and later appointed the same *pro bono* counsel to represent its interests on appeal.

from CJA funds for post-trial work). *Id.* The court concluded that, "[g]iven the substantial amount of money that Mr. Mahoney has already been paid, it would be an abuse of CJA resources to compensate him for anything beyond what he has already received." *Id.* at *8.

The district court then examined the nature of the "fully retained" inquiry to determine whether the Western District's practice is compatible with the CJA. *See id.* at *9; *see also infra* Part II (summarizing the district court's description). In rejecting defendant's claim, the court noted that a mid-case appointment occurred in this case and thus found that the "'fully retained' inquiry is *not* (as defense counsel characterizes it) a complete prohibition on mid-case CJA appointments." *Id.* at *10. The purpose of the inquiry, according to the district court, is that it serves to alert defense counsel that, before making the appointment, the court will require "a full and complete disclosure" of the pertinent facts including the nature of the retainer agreement and the changed circumstances. *Id.* (internal quotation marks omitted). The court also asserted that permitting an attorney to appear on an *ad hoc* basis would create the potential for abuse of CJA procedures. *Id.* Consequently, the court concluded that the "fully retained" inquiry is "not only consistent with the spirit of the CJA," but also is "devised to curtail abuses of it." *Id.* The court noted that, if a defendant has some resources, but not enough to fully retain his attorney, counsel could seek "partial appointment" in accordance with section 2.05 of the Guidelines for the Administration of the Criminal Justice Act ("CJA Guidelines") and 18 U.S.C. § 3006A(f). *Id.* at *11 & n. 18.[8] Parker appealed once again.

On appeal, Parker challenges the district court's eligibility determination for mid-case appointment of CJA counsel. Specifically, he argues that the district court failed to make an appropriate inquiry into his financial status, erred in assuming that he was ineligible for CJA relief if he was receiving *any* income, and failed to evaluate several of the most relevant factors bearing on the "interests of justice" as required by the CJA. 18 U.S.C. § 3006A(c). Parker also asserts that the W.D.N.Y.'s practice of extracting an assurance from attorneys that they are "fully retained," as a precondition to entering an appearance, is inconsistent with the opportunity for mid-case appointment under the Act.

In response, W.D.N.Y. contends that the district court appropriately denied mid-case appointment of counsel under the CJA. It argues that the district court was not clearly erroneous in concluding that Parker was financially ineligible and that, even if Parker was financially eligible, CJA appointment was unwarranted because Mahoney had already received approximately ten times the presumptive CJA maximum. Finally, W.D.N.Y., noting that its policy of asking whether counsel has been "fully retained" does not represent a complete prohibition of mid-case appointment, argues that its practice is consistent with (and indeed, advances) the policies underlying the CJA.

Our task therefore on appeal is to address two primary questions. First, whether Parker's request for CJA counsel should have been granted as of January 8, 2002, when the application was first made, instead of April 12, 2002, when Mahoney was actually appointed. Second, whether the district court's practice of requiring a

8. The district court also determined that Parker's CJA application should be unsealed as his trial (and therefore, the concern over prej-

udice) had ended. *Parker III*, 2004 WL 2095684, at *11. Defendant does not challenge this determination on appeal.

"fully retained" assurance from counsel as a precondition to an appearance in a criminal proceeding is compatible with the CJA's authorization of mid-case appointment of counsel under 18 U.S.C. § 3006A(c).

## DISCUSSION [9]

### I. The Denial of CJA Appointment Under 18 U.S.C. § 3006A(c)

■ The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. "[A]bsent a knowing and intelligent waiver, no person may be imprisoned for any offense, whether classified as petty, misdemeanor, or felony, unless he was represented by counsel at his trial." *Argersinger v. Hamlin,* 407 U.S. 25, 37, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972). "The right to be heard would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel." *Gideon,* 372 U.S. at 344–45, 83 S.Ct. 792. (quoting *Powell v. Alabama,* 287 U.S. 45, 68–69, 53 S.Ct. 55, 77 L.Ed. 158 (1932)).

■ In accordance with this constitutional mandate, Congress passed the Criminal Justice Act of 1964. The CJA ensures that "defendants who are financially unable to afford trial services necessary to an adequate defense are provided them in accordance with the Sixth Amendment." *United States v. Barcelon,* 833 F.2d 894, 896 (10th Cir.1987); *see also Heath v. U.S. Parole Comm'n,* 788 F.2d 85, 88 (2d Cir. 1986) (noting that right to counsel under the CJA is "derived from the Sixth

---

**9.** We are obligated to consider whether the requirements of subject-matter jurisdiction are satisfied in this case. *See Mehlenbacher v. Akzo Nobel Salt, Inc.,* 216 F.3d 291, 295 (2d Cir.2000). This Court has held, in the context of a payment for expert fees under § 3006A(e), that "orders concerning fee determinations for services already rendered under § 3006A are not appealable orders under § 1291." *United States v. Bloomer,* 150 F.3d 146, 148 (2d Cir.1998) (per curiam); *see also United States v. Yousef,* 395 F.3d 76, 78 (2d Cir.2005) (concluding that, because we did not have jurisdiction over the case, we are without jurisdiction to consider counsel's claim for compensation as represented in his CJA voucher). Other circuits have found that fee determinations under § 3006A(d) are non-appealable. *See, e.g., United States v. Stone,* 53 F.3d 141, 143 (6th Cir.1995); *United States v. Rodriguez,* 833 F.2d 1536, 1537 (11th Cir. 1987) (per curiam).

However, we believe that the denial of mid-case appointment under § 3006A(c), at least in the circumstances of this case, constitutes a "final decision" under the collateral order doctrine, *see Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 545–47, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), and is thus appealable under 28 U.S.C. § 1291. *Cf. United States v. Harris,* 707 F.2d 653, 657–58 (2d Cir.1983)

(holding that order terminating appointment of defense counsel is appealable under *Cohen* ); *Miller v. Pleasure,* 296 F.2d 283, 284 (2d Cir.1961) (per curiam) (holding that order allowing appellant to proceed *in forma pauperis* but declining to assign counsel for his assistance is appealable as collateral order). *But cf. United States v. Kane,* 955 F.2d 110, 111–12 (1st Cir.1992) (holding that orders denying the appointment of counsel are not immediately appealable under 28 U.S.C. § 1291 and suggesting that *Harris* does not survive the rationale of *Flanagan v. United States,* 465 U.S. 259, 104 S.Ct. 1051, 79 L.Ed.2d 288 (1984)); *United States v. Celani,* 748 F.2d 363, 365–66 (7th Cir.1984) (same).

While recognizing that " 'the question appears close,' " *United States v. Birrell,* 482 F.2d 890, 892 (2d Cir.1973) (per curiam) (quoting *Miller,* 296 F.2d at 284), we follow the rationale of several earlier cases by "resolv[ing] the doubt in favor of appealability," *id.* (citing *Miller,* 296 F.2d at 284); *cf. Harris,* 707 F.2d at 657–58 (noting that the "issue is not a simple one" and that the "competing considerations are strong" but concluding that "appellant has satisfied the requirements of the *Cohen* doctrine for immediate appealability"). "Although we do not regard the issue of the appealability of such an order as forever foreclosed, there is no need to reconsider it here." *Birrell,* 482 F.2d at 892.

Amendment's guarantee"). In enacting the CJA, Congress recognized that "all defendants are entitled to help at every stage of a criminal proceeding and that a lawyer, like a laborer, is worthy of hire." *United States v. Burnett*, 989 F.2d 100, 101 (2d Cir.1993).

Accordingly, the CJA establishes the broad institutional framework for appointing counsel for a criminal defendant who is financially unable to obtain representation. *See* 18 U.S.C. § 3006A. Subsection 3006A(a) of the Act directs that "[e]ach United States district court, with the approval of the judicial council of the circuit, shall place in operation throughout the district a plan for furnishing representation for any person financially unable to obtain adequate representation in accordance with this section." 18 U.S.C. § 3006A(a). Pursuant to § 3006A(a), the Western District of New York has established a Criminal Justice Act Plan to facilitate the appointment of counsel for financially eligible defendants. *See* Criminal Justice Act Plan for the United States District Court for the Western District of New York (Apr. 5, 2001) ("W.D.N.Y. CJA Plan" or the "Plan"), *available at* http://www.nywd.uscourts.gov/document/CJAplan.pdf.[10]

The CJA also establishes both the procedures for appointing counsel and the standards governing mid-case appoint-ment. *See* 18 U.S.C. § 3006A(b)-(c). Subsection 3006A(b) provides that, "[i]n every case in which a person entitled to representation under a plan approved under subsection (a) appears without counsel, . . . the United States magistrate judge or the court, if satisfied after *appropriate inquiry* that the person is financially unable to obtain counsel, shall appoint counsel to represent him." 18 U.S.C. § 3006A(b) (emphasis added). Subsection 3006A(c)—the specific provision at issue here—provides in relevant part: "If at any stage of the proceedings, including an appeal, the United States magistrate judge or the court finds that the person is *financially unable to pay counsel whom he had retained*, it may appoint counsel as provided in subsection (b) and authorize payment as provided in subsection (d), *as the interests of justice may dictate*." *Id.* § 3006A(c) (emphasis added).

This Court has reviewed financial eligibility determinations regarding the appointment of CJA counsel pursuant to 18 U.S.C. § 3006A only in a limited number of cases. In *United States v. Harris*, 707 F.2d 653 (2d Cir.1983), a case involving the termination of appointed counsel, we concluded that a district court's financial eligibility determination was not clearly erroneous. *Id.* at 662. In *Harris*, we considered the "material misrepresentations and misstatements" in the defen-

---

10. The other district courts within this Circuit have similar CJA plans. *See* United States District Court, Northern District of New York, Plan for the Composition, Administration and Management of the Panel of Private Attorneys and the Office of the Federal Public Defender Under the Criminal Justice Act (Dec. 12, 2005), *available at* http://www.nynd.uscourts.gov/documents/GO1.pdf; Revised Plan of the United States District Court Eastern District of New York Pursuant to the Criminal Justice Act of 1964 (July 27, 2005), *available*

at http://www.nyed.uscourts.gov/cjaplan.pdf; United States District Court, Southern District of New York, Revised Plan for Furnishing Representation Pursuant to the Criminal Justice Act (July 14, 2005), *available at* http://www.nysd.uscourts.gov/pub/cjaplan.pdf; United States District Court, District of Vermont, Revised Plan for Furnishing Representation Pursuant to the Criminal Justice Act (July 14, 2000), *available at* http://www.vtd.uscourts.gov/SupportingFiles/CJA/cjaplan4.pdf; United States District Court, District of Connecticut, Criminal Justice Act Plan (July

dant's financial affidavit. *Id.* at 661. We also emphasized that the defendant had received "substantial income" over the preceding two years even though the magistrate judge did not make an "explicit finding" that the defendant "presently has an X amount of money" or that defendant's money was "sufficient to meet the estimated cost" of representation. *Id.* (internal quotation marks omitted). The defendant pressed that, in making a financial eligibility determination, "the court must explicitly consider his ability to afford counsel in light of economic realities—the cost of a criminal defense and the cost of providing for himself and dependents." *Id.* We concluded that there was "no indication in [the] record that the magistrate and the district judge did not consider these economic realities, although we would prefer more explicit findings when such questions arise again." *Id.* at 662.

In two other cases, this Court also affirmed district court determinations of financial ineligibility. *See United States v. O'Neil,* 118 F.3d 65, 74 (2d Cir.1997);

*United States v. Rubinson,* 543 F.2d 951, 964 (2d Cir.1976). In *O'Neil,* we highlighted the defendant's significant business investments and expected income. 118 F.3d at 74. We also noted the defendant's admission that "I didn't say that I couldn't afford counsel. I couldn't afford the counsel that I had been talking to." *Id.* Likewise, in *Rubinson,* we affirmed the district court's determination of ineligibility even though the lower court relied solely on the defendant's own testimony regarding the value of his house. 543 F.2d at 963. We noted that the evidence also established that the defendant "owned or controlled substantial assets" and had hidden those assets "to conceal them from his creditors, the government and the court." *Id.* at 964. In each case, we concluded that the district court's financial eligibility determination was not clearly erroneous.[11]

██ Reviewing a district court's determination of financial eligibility for mid-case appointment under § 3006A(c)—an issue of first impression in this Circuit—requires a three-fold determination. First,

---

10, 1992) (D. Conn. CJA Plan), *available at* http://www.ctd.uscourts.gov/cja/cja_plan_1.pdf.

**11.** Normally, the "primary focus" of the CJA is on "providing adequate counsel for trials on substantive offenses." *Miranda v. United States,* 455 F.2d 402, 404 (2d Cir.1972). "The purpose of the Act, as stated in its preamble, is '[t]o promote the cause of criminal justice by providing for the representation of defendants who are financially unable to obtain an adequate defense in criminal cases in the courts of the United States.'" *United States v. Bailey,* 581 F.2d 984, 988 (D.C.Cir.1978) (quoting Criminal Justice Act of 1964, Pub.L. No. 88–455, 78 Stat. 552). Certainly in cases such as *O'Neil* and *Rubinson,* where the determinations of financial eligibility under 18 U.S.C. § 3006A were made in the context of providing adequate counsel at the onset of the trial, the "primary focus" is on securing adequate counsel for defendants. *Cf. Tyler v. Lark,* 472 F.2d 1077, 1080 (8th Cir.1973) (asserting that "the purpose of the statute is to protect indigent defendants and not to pro-

vide compensation in whole or in part for appointed counsel").

However, the "primary focus" in cases arising under 18 U.S.C. § 3006A(c) depends on the circumstances of each case. In a case such as *Harris,* involving the termination of counsel, ensuring adequate counsel for the defendant continues to be the paramount goal. *See Harris,* 707 F.2d at 657 (emphasizing the "unedifying spectacle of a trial of a lawyerless defendant"). Likewise, where a defendant's previously retained counsel has withdrawn from representation and an unrepresented defendant seeks a mid-case appointment, the primary focus is on securing adequate counsel to represent the defendant. In contrast, where a defendant's previously retained counsel has not withdrawn from representation and a represented defendant seeks a mid-case appointment, the "primary focus" is slightly different, as the defendant already has representation. Therefore, in cases such as the instant case, the "primary focus" is not on providing adequate counsel but rather on compensating existing counsel whom a defendant retained but is no longer able to pay.

did the district court conduct an "appropriate inquiry" into the defendant's financial eligibility? Second, if the district court conducted an appropriate inquiry, was the court correct in its ultimate conclusion of financial eligibility? Third, if the district court conducted an appropriate inquiry and defendant is financially eligible for mid-case appointment, did the district court err in its weighing of the "interests of justice"? Although "doubts as to eligibility should be resolved in a defendant's favor," *Harris*, 707 F.2d at 660, "the burden is on the defendant to show that he is unable to afford representation." *O'Neil*, 118 F.3d at 74.[12]

### A. *The "Appropriate Inquiry"*

■ Courts have utilized a broad range of considerations in conducting an "appropriate inquiry" into financial eligibility under 18 U.S.C. § 3006A. The task "necessarily varies with the circumstances presented, and no one method or combination of methods is required." *Barcelon*, 833 F.2d at 897. "In many cases, the court's inquiry may properly be limited to review of financial information supplied on the standard form financial affidavit." *United States v. Gravatt*, 868 F.2d 585, 589 (3d Cir.1989). "Investigation of the applicant's assets, liabilities, income and obligations alone may constitute sufficient inquiry." *Barcelon*, 833 F.2d at 897 (collecting cases).

We have examined a variety of factors relevant to the financial eligibility determination. In *Harris*, we highlighted the "economic realities" of the situation including the costs of a criminal defense. 707 F.2d at 661. In *O'Neil*, we focused on the business investments of the defendant. 118 F.3d at 74. Similarly, in *Rubinson*, we considered whether the defendant owned or controlled substantial assets and whether the defendant had concealed those assets. 543 F.2d at 964. We also indicated that "a defendant's own funds must be weighed against the anticipated cost of trial." *Id.* (citing *Hardy v. United States*, 375 U.S. 277, 289 n. 7, 84 S.Ct. 424, 11 L.Ed.2d 331 (1963)).

■ We have also considered the defendant's necessities and the "cost of providing for himself and dependents." *Harris*, 707 F.2d at 661; *cf. United States v. Bracewell*, 569 F.2d 1194, 1199–1200 (2d Cir.1978) (admonishing a construction of the Act that "ignores the realities of a defendant's duties with respect to his family"). The CJA Guidelines likewise instruct courts to consider "the cost of providing the person and his dependents with the necessities of life." VII Admin. Office of U.S. Courts, Guide to Judiciary Policies and Procedures § 2.04 (2001); *see also* A.B.A. Standards for Criminal Justice § 5–7.1 (3d ed.1992) (noting that "[c]ounsel should be provided to persons who are financially unable to obtain adequate representation without substantial hardship"). Indeed, in the related context of reimbursement under 18 U.S.C. 3006A(f), we have emphasized that "the needs of the defendant himself must be considered" and insisted that the district judge should be satisfied that "the defendant will not suffer

---

12. While we review the district court's decision regarding financial eligibility under the "clearly erroneous" standard, *see O'Neil*, 118 F.3d at 74; *Harris*, 707 F.2d at 660; *Rubinson*, 543 F.2d at 964, we review the adequacy and manner of the district court's inquiry *de novo*. *Cf. Barcelon*, 833 F.2d at 896 (noting that the clearly erroneous standard does not apply for reviewing "the adequacy and manner of the inquiry by the district court"); *United States v. Martin–Trigona*, 684 F.2d 485, 490 (7th Cir.1982) (holding that "trial court's failure to conduct an appropriate inquiry into [defendant's] financial ability to retain counsel was reversible error").

extreme hardship." *Bracewell*, 569 F.2d at 1199.[13]

■ Parker argues that the district court failed to make an "appropriate inquiry" into his financial status by refusing to consider the costs of retaining counsel, his ability to pay for the required legal services, and his legitimate expenses. Specifically, Parker contends that the district court erred in failing to make "explicit findings" about the "economic realities" of the situation including the costs of legal representation. *Harris*, 707 F.2d at 661–62. He also asserts that the district court failed to consider his ability to pay for the required legal services and that "there is simply no serious or objective basis for the judge to think that [$5,460.09 over a fourteen-week period] would be sufficient." Finally, Parker argues that the district court erred in not considering his additional expenses including the rent he owed his mother and the financial support he provided his children. We conclude, however, that the district court engaged in an "appropriate inquiry" with regard to each of these factors.

As an initial matter, we note that our task of reviewing the district court's inquiry into the costs of counsel is hindered because, although Mahoney indicated to the magistrate that he had been "fully retained," Mahoney never entered into a retainer agreement with Parker. "As soon as feasible after a lawyer has been employed, it is desirable that a clear agreement be reached with the client as to the basis of the fee charges to be made. Such a course will not only prevent later misunderstanding but will also work for good relations between the lawyer and the client." N.Y.Code of Prof'l Responsibility E.C. 2–19. Here, counsel's failure to utilize a retainer agreement no doubt impeded the district court's task of calculating Parker's anticipated and actual trial costs (and thus, of inquiring into whether defendant was financially unable to pay counsel whom he had retained).

Parker argues that, even without a retainer agreement, the district court should have made "explicit findings" about the costs of providing counsel. In *Harris*, we indicated that, with respect to the costs of providing counsel, "we would prefer more explicit findings when such questions arise again." 707 F.2d at 662. However, in *Harris*, we approved the district court's inquiry because there was "no indication in th[e] record that the magistrate and the district judge did not consider these economic realities." *Id.* Here, not only is there no indication in the record that the district court failed to consider these economic realities, there is actually a fair

---

**13.** In making similar determinations under 18 U.S.C. § 3006A and related provisions, the United States Supreme Court and other Courts of Appeals have also considered such factors as the availability of income to the defendant from other sources, *see, e.g., United States v. Kahan*, 415 U.S. 239, 240–41, 94 S.Ct. 1179, 39 L.Ed.2d 297 (1974) (per curiam) ("Totten trusts"), *Tavery v. United States*, 32 F.3d 1423, 1429 (10th Cir.1994) (tax refunds), *United States v. Caudle*, 758 F.2d 994, 996 (4th Cir.1985) (spousal income), the possibility of reimbursement of legal fees, *United States v. Brockman*, 183 F.3d 891, 897–98 (8th Cir.1999), the liquidity of assets for purposes of paying counsel, *Bar-* *celon*, 833 F.2d at 897, the applicant's ability to pay a portion of his counsel's fees, *Wood v. United States*, 389 U.S. 20, 20–21, 88 S.Ct. 3, 19 L.Ed.2d 20 (1967) (per curiam), the defendant's failure to authorize a review of his financial records, *United States v. Bauer*, 956 F.2d 693, 694 (7th Cir.1992), and the defendant's credibility (or lack thereof) in portraying his financial eligibility, *United States v. Binder,* 794 F.2d 1195, 1202 (7th Cir.1986). Overall, as one circuit court has noted, the history of the CJA supports the view that "a district court should not restrict itself to a particular method of assessing a criminal defendant's eligibility for appointed counsel." *Gravatt*, 868 F.2d at 590 n. 7.

indication that the district court explicitly considered the costs of providing counsel. Indeed, in addition to noting that Mahoney was "fully aware of the costs involved in defending Parker" because he is "an experienced defense attorney," *Parker III*, 2004 WL 2095684, at *8, the court explicitly rejected Mahoney's claim that "defending this case would require a fee in excess of $125,000," *id.* at *7, and instead concluded that "Mahoney's work in this case was not so extensive as to require compensation beyond what he has already been paid," *id.* at *8.

▇▇▇ The district court also properly inquired into Parker's ability to pay for the required legal services. We noted in *Harris* that a defendant's claim of inability to afford counsel can be rebutted "by inference and circumstantial evidence." 707 F.2d at 661. Thus, in order to conduct an appropriate inquiry, a district judge may rely on circumstantial evidence, including an applicant's "assets, liabilities, income and obligations," *Barcelon*, 833 F.2d at 897, if this evidence creates a reasonable inference that a defendant is able to pay. Indeed, in *Harris*, our inquiry focused on the defendant's "substantial income" over the preceding two years. 707 F.2d at 661.

▇▇▇ Here, the district court reviewed defendant's CJA Form 23 financial affidavit including his assets, liabilities, income and obligations. *See Parker III*, 2004 WL

2095684, at *2, 6–7. The district court also made explicit findings with regard to Parker's income from 1998 and 2001. *See id.* at *3. Finally, the court found that Parker continued to receive his salary over the relevant fourteen-week period. *See id.* at *6 & nn. 8–10. While a district court should make factual findings to determine a defendant's ability to pay, the district court need not make an "explicit finding" that the defendant "presently has an X amount of money" to pay for his representation. *Harris*, 707 F.2d at 661. Thus, the district court's review of defendant's financial affidavit, coupled with its findings regarding his income from 1998 and 2001, as well as his salary over the relevant fourteen-week period, was sufficient to constitute an "appropriate inquiry" into defendant's ability to pay.

Finally, with regard to defendant's legitimate expenses, the district court explicitly considered whether defendant's rent obligation and additional child support payments should be deducted from his available income. The district court noted that Parker had not listed the rental payment to his mother on his CJA Form 23 financial affidavit. *Parker III*, 2004 WL 2095684, at *6 n. 11. It also doubted whether, during the period in which Parker was incarcerated, it was necessary for Parker to continue "paying" rent to his mother.[14] *Id.* In any event, even though

---

14. While it was unclear (even for Parker) whether he still owned a four-unit apartment building—then subject to pending foreclosure proceedings—it is undisputed that the house he rented on 635 Northumberland was still in his name. Parker's mother stated in an affidavit that she actually purchased the house and was the sole contributor to the mortgage. According to her, title of the house was placed in Parker's name to "establish credit." Parker's mother thus asserted that "any equity in this house would not be an asset to which Darnyl could turn to fund his defense." Of course, that raises an interesting issue—

equity in the house was available to assist Parker in establishing that he was creditworthy but was not available to pay for his defense in a criminal action. However, even assuming that Parker could not have utilized the house's equity for his defense, Parker could conceivably have lived in the house (assuming that he had not been in jail) without paying any rent because he possessed title to the house. Thus, because Parker most likely could have resided at the property on 635 Northumberland, the district court appropriately rejected this additional rent obligation as constituting a necessary expense.

Parker failed to list rent on his CJA financial affidavit, the district court considered his rent payments as a possible expense. See id. (listing three reasons why "Parker's purported rental payment to his mother" was not a "necessity" during this period). Thus, because the district court conducted an "appropriate inquiry" with regard to this factor, Parker's only possible disagreement is with the district court's conclusion, which we review below for clear error.

The district court also considered whether additional child support payments should be deducted from Parker's available income. Child support payments for Parker's children were automatically deducted from his gross salary. Mahoney, however, claimed that Parker was also the primary provider for two of his grandchildren, even though Parker did not identify those grandchildren as dependents in his CJA financial affidavit. While it is possible that Parker may have provided additional financial support to his children (or grandchildren) over and above his automatic salary deductions, Parker failed to produce any evidence that he provided additional financial assistance to his children (or grandchildren). Because "the burden is on the defendant to show that he is unable to afford representation," O'Neil, 118 F.3d at 74, Parker's failure to provide evidence cannot be offered as proof that the district court failed to conduct an "appropriate inquiry" into these expenses. "It is the responsibility of the defendant to provide the court 'with sufficient and accurate information upon which the court can make an eligibility determination.'" United States v. Anderson, 400 F.Supp.2d 32, 35 (D.D.C.2005) (quoting VIII Admin. Office of U.S. Courts, Guide to Judiciary Policies and Procedures § 203(C) (2005)). The court's responsibility to "inquire" does not

exceed Parker's obligation to make his case for appointed counsel.

We therefore conclude that the district court thoroughly considered defendant's necessities and the "cost of providing for himself and dependents." Harris, 707 F.2d at 661. The court examined Parker's net income, his necessities, and his children's necessities. See Parker III, 2004 WL 2095684, at *6. We also note that the district court did not err in considering that Parker's initial CJA application in January of 2002 was "premised entirely" upon his purported change in financial circumstances, id., even though, as it turned out, Parker continued to receive his salary until April 12, 2002. See United States v. Binder, 794 F.2d 1195, 1202 (7th Cir.1986) (considering defendant's credibility in portraying his financial eligibility); cf. Harris, 707 F.2d at 661 (noting that "a court need not take at 'face value' an affidavit professing 'sudden indigency' which contains material misstatements and misrepresentations" (quoting United States v. Kelly, 467 F.2d 262, 266 (7th Cir.1972))). The district court conducted an "appropriate inquiry" into Parker's financial eligibility.

## B. The Financial Eligibility Determination

Parker also challenges the district court's ultimate conclusion that he was financially able to pay Mahoney. As noted above, we review the district court's decision regarding financial eligibility for clear error. See O'Neil, 118 F.3d at 74; Harris, 707 F.2d at 660; Rubinson, 543 F.2d at 964. The defendant must show that "he is unable to afford representation, though he need not prove that he is indigent." O'Neil, 118 F.3d at 74; see also Harris, 707 F.2d at 660 (noting that the standard for appointing counsel is "something less than indigency or destitution").

However, the statutory language that the defendant must be "financially unable" to afford representation, 18 U.S.C. § 3006(c), like the statutory language that the district court must make an "appropriate inquiry," 18 U.S.C. § 3006(b), is indeterminate. "As a practical matter, there can be no precise rules defining when a defendant is financially unable to obtain an adequate defense." 3B CHARLES ALAN WRIGHT, NANCY J. KING & SUSAN R. KLEIN, FEDERAL PRACTICE & PROCEDURE § 732 (3d ed.2004).

The CJA Guidelines give some guidance on this "terse statutory definition." *In re Boston Herald, Inc.*, 321 F.3d at 178. The Guidelines indicate that the standard applies to a defendant whose "net financial resources and income are insufficient to enable him to obtain qualified counsel" and that, as we emphasized in *Harris* and above, courts should consider "the cost of providing the person and his dependents with the necessities of life." VII Admin. Office of U.S. Courts, Guide to Judiciary Policies and Procedures § 2.04 (2001); *see also* 3B WRIGHT, KING, & KLEIN, FEDERAL PRACTICE & PROCEDURE § 732 (defining financial eligibility under 18 U.S.C. § 3006A as defendant's inability to "pay for adequate representation without substantial hardship to himself or his family").

Here, we do not believe that the district court committed clear error in finding that Parker was financially ineligible for the appointment of CJA counsel between January 8, 2002, and April 12, 2002. During the relevant period, Parker continued to receive his regular pay checks and earned a net income of approximately $5,460.09. This salary was equivalent to (or only slightly below due to the absence of overtime) the salary that Mahoney knew Parker was receiving when Mahoney agreed to represent him. Likewise, Parker's expenses did not increase during this period and most likely decreased due to his incarceration. The "changed circumstances" that Parker offered as grounds for a mid-case appointment thus involved Parker's decision to proceed to trial and not any change in his ability to pay.

Moreover, like the defendant in *Harris*, Parker received "substantial income" over two of the immediately preceding years. 707 F.2d at 661. Although Parker did not provide any information on his salary for 1999 or 2000 because of self-incrimination concerns, Parker earned $70,613 in 1998 and $54,000 in 2001. In light of Parker's salary between January 8, 2002, and April 12, 2002, the uniformity of his expenses from when he retained Mahoney to his application for CJA counsel, and his "substantial income" in 1998 and 2001, we cannot say that the district court was clearly erroneous in concluding that Parker was financially able to pay his retained counsel.

Parker points out that he was not receiving any income at the time of his original application and asserts that the additional income that he later received was not foreseeable. We assume good faith on the part of both Parker and Mahoney in not being aware of the continuing payments either at the time of Parker's initial CJA application or at any point before this information was revealed during the February 26th testimony of Captain Morgan. *Cf.* W.D.N.Y. CJA Plan, at *9 (Part XI.L) ("If, at any time after appointment, counsel obtains information that a client is financially able to make payment, in whole or in part, for legal or other services in connection with his or her representation, and the source of the attorney's information is not protected as a privileged communication, counsel shall advise the Court."). In any event, the revelation of continuing payments became a part of the record before the district court's initial decision in *Parker I* on March 4, 2002. Thus, the fact that it may not have been foreseeable at the time of Parker's CJA application that he would

continue to receive his salary is completely irrelevant in evaluating whether the district court's post-remand decision was clearly erroneous. "To reject a finding of fact as clearly erroneous, we must, *upon review of the entire record,* be 'left with the definite and firm conviction that a mistake has been committed.' " *United States v. Garcia,* 413 F.3d 201, 222 (2d Cir.2005) (quoting *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948) (emphasis added)). The district judge is thus entitled to make his financial eligibility determination based on the entire record and not merely the facts as defendant or his counsel perceived them at the time of the application.

Parker also contends that the district court erred in assuming that he was ineligible for CJA relief if he was receiving *any* income (that is, in requiring him to have *no* income prior to CJA appointment). While the district court's eligibility determination did change immediately after defendant stopped receiving his salary on April 12, 2002, the district court did not impose (either explicitly or implicitly) an additional requirement that defendant must have no income prior to CJA appointment. The district court viewed a decrease in defendant's income from defendant's full salary to no salary as a significant (and here, determinative) factor in concluding that defendant had become eligible for CJA relief. Such a calculation is certainly reasonable and does not constitute an error as a matter of law.[15] Moreover, as noted above, up to that point in time, Parker's continued receipt of his salary, the uniformity of his expenses, and his previous income are sufficient evidence that he was financially able to pay counsel whom he had retained. Thus, no legal error occurred, and the district court's factual determination was not clearly erroneous.

▮ Finally, Parker argues that the district court should have used the device of "partial appointment" pursuant to section 2.05 of the CJA Guidelines and 18 U.S.C. § 3006A(f).[16] Parker contends that, while his income may have been above his necessities, it was not enough to continue to pay his retained attorney.

---

**15.** *Cf. United States v. Graham,* 72 F.3d 352, 356 & n. 3 (3d Cir.1995) (recommending that the district court make findings concerning defendant's "ability to earn income in the future" because "since he has been incarcerated, [defendant] has had no income or expenses"); *Gravatt,* 868 F.2d at 589–90 (noting that revelation that defendant "was unemployed and was the sole source of support for his wife and himself" was "financial information [that] tended to support his eligibility for appointed counsel"); *Barcelon,* 833 F.2d at 899 (remanding district court's determination that defendant could financially afford to retain counsel where defendant "had obligations and was presently unemployed").

**16.** Section 2.05 of the CJA Guidelines states in relevant part:

> 2.05 Partial Eligibility. If a person's net financial resources and income anticipated prior to trial are in excess of the amount needed to provide him and his dependents with the necessities of life and to provide the defendant's release on bond, but are insufficient to pay fully for retained counsel, the judicial officer should find the person eligible for the appointment of counsel under the Act and should direct him to pay the available excess funds to the Clerk of the Court at the time of such appointment or from time to time thereafter. Such funds shall be held subject to the provisions of subsection (f).

> VII Admin. Office of U.S. Courts, Guide to Judiciary Policies and Procedures § 2.05 (2001).

> Subsection (f) of the Criminal Justice Act states in relevant part:

> (f) Receipt of other payments.—Whenever the United States magistrate judge or the court finds that funds are available for payment from or on behalf of a person furnished representation, it may authorize or direct that such funds be paid to the appointed attorney, to the bar association or legal aid agency or community defender

Neither Parker nor Mahoney raised the prospect of "partial appointment" in Parker's initial application for mid-case appointment of CJA counsel. The district court noted that "partial appointment" at the outset is the "preferred method under the CJA where the defendant has some resources, but not enough to fully retain his attorney" but declined to make such an appointment. *Parker III*, 2004 WL 2095684, at *11 n. 18.

In *Bracewell*, a case involving the availability of defendant's funds for reimbursement, we noted that § 3006A(f) "does not, by its terms, explain how it is to be applied." 569 F.2d at 1198. However, we found that, "[i]n the absence of a serious abuse of discretion, a district judge's findings as to 'availability' of funds, if supported by an 'adequate inquiry', will not be disturbed on appeal." *Id.* at 1200; *cf. Harris*, 707 F.2d at 659, 663 (declining to employ "less drastic remedies" involving recoupment under § 3006A(f) where the defendant is financially able to obtain counsel). Here, in addition to concluding that the district court conducted an appropriate inquiry and that its financial eligibility determination was not clearly erroneous, we believe that the district court did not abuse its discretion in failing to make a "partial appointment."

## C. The "Interests of Justice"

 Finally, because we conclude that the district court's financial eligibility determination was not clearly erroneous, we need not reach defendant's argument that the district court erroneously concluded that the mid-case appointment would not be in the "interests of justice." 18 U.S.C. § 3006A(c). *See Fair Housing in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 368 n. 8 (2d Cir. 2003). While the district court noted the "substantial amount" already contributed to counsel, *Parker III*, 2004 WL 2095684, at *8, Parker argues that the district court failed to evaluate several of the other factors bearing on the "interests of justice," including the actual services Mahoney provided Parker, Parker's supererogatory attempts to compensate Mahoney, Mahoney's effective hourly rate, the economic hardship to Mahoney, and the change of circumstances that resulted in a trial. The district court's determination of financial eligibility, however, is made *prior to* its weighing of the "interests of justice." *See* 18 U.S.C. § 3006A(c) ("*If* ... the court finds that the person is financially unable to pay counsel whom he had retained, it may appoint counsel ... as the interests of justice may dictate.") (emphasis added). Therefore, because a finding of financial eligibility is a necessary (although not sufficient) condition for mid-case appointment under the Act, we need not examine the district court's "interests of justice" determination where, as here, the district court was not clearly erroneous in finding defendant financially ineligible.[17]

## II. The "Fully Retained" Inquiry and the CJA

 Parker argues that the W.D.N.Y.'s practice of extracting an assur-

organization which provided the appointed attorney, ... or to the court for deposit in the Treasury as a reimbursement to the appropriation, current at the time of payment, to carry out the provisions of this section.

18 U.S.C. § 3006A(f).

**17.** We note that in weighing the "interests of justice" district courts may wish to consider a variety of factors, including (but not limited to) whether the failure of the retainer agreement was the result of a sudden or permanent change in assets, liabilities, income and obligations, whether the failure of the retainer was the product of a change in circumstances, miscommunication, or unarticulated expectations, or whether (as described below) the failure involved a scheme to circumvent the CJA procedures.

ance from retained attorneys that they are "fully retained" for the duration of the proceedings, as a precondition to entering an appearance, is inconsistent with the CJA's authorization of mid-case appointment under 18 U.S.C. § 3006A(c). He contends that the explicit purpose of the "fully retained" inquiry is to circumvent § 3006A(c) and to deter applications for mid-case appointment by precluding previously retained counsel from later suggesting that the client has become unable to pay. Mahoney claims the practice shifts all of the risk of the defendant's inability to pay to the defense attorney, "as if there were no statutory provision for mid-case appointment at all."

In reviewing the compatibility of the district court's practice with § 3006A(c), "we begin with the language of the statute itself." *Virgilio v. City of New York*, 407 F.3d 105, 112 (2d Cir.2005). The Act specifically refers to "counsel whom [the defendant] had *retained.*" 18 U.S.C. § 3006A(c) (emphasis added). As a result, a district court's practice of asking whether defense counsel has been "retained" seems on its face to be compatible with § 3006A(c), which assumes that counsel is "retained." On the other hand, the language of the statute itself—allowing for the appointment of "counsel whom he had retained"—makes clear that there are certain circumstances in which CJA counsel may be appointed despite a defendant's initial appearance with retained counsel or counsel's earlier assurance that he is "fully retained." Thus, the fact that defense counsel has stated that he or she is "fully retained" at an initial appearance cannot automatically preclude the possibility of mid-case appointment. The determinative legal question is therefore whether any aspect of the district court's local practice prevents the possibility of mid-case appointment under 18 U.S.C. § 3006A(c). That is, we must inquire as to the nature of the circumstances (if any) in which the district court would allow or disallow mid-case appointment even after an attorney indicated that he was "fully retained" for the entire proceeding.[18]

If a district court grants a mid-case appointment of counsel, the interests of justice may dictate that the district court appoint previously retained counsel depending on counsel's familiarity with the case, the importance of continuity of representation, and the potential for delay if new counsel is appointed. *See, e.g., Herbawi*, 913 F.Supp. at 173 (suggesting that, "given the complex nature of the case and the volume of discovery produced by the government, continuity of counsel would be the most efficient and least disruptive course of action"); *cf. Whiting v. Lacara*, 187 F.3d 317, 323 (2d Cir.1999) (noting that "the interest of the district court in preventing counsel from withdrawing on the eve of trial is substantial").

However, the CJA does not require the appointment of previously retained counsel. Indeed, some CJA plans expressly disallow or discourage such appointments. *See, e.g.,* D. Conn. CJA Plan, at *8 (Part IX.A) (instructing that appointment should not be made from outside the Federal Public Defender's Office or the CJA panel except in "extraordinary circumstances"). "There is no need to decide on this record which state interests might be sufficient to overcome an indigent defendant's interest in continued representation by a particular attorney with whom he has developed a relationship." *Morris v. Slappy*, 461 U.S. 1, 23 n. 5, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983) (Brennan, J., concurring in the result).

18. As an initial matter, we also note that retainer agreements have various forms encompassing different property right arrangements. First, "a retainer can be paid simply to ensure an attorney's availability to represent the client, whether or not services are ever performed." *In re Equip. Servs., Inc.*, 290 F.3d 739, 746 (4th Cir.2002); *see also United States v. D'Amato*, 39 F.3d 1249, 1262 (2d Cir.1994) ("Retainer agreements that keep providers of services available are commonplace, and sometimes those services are not needed."). Second, "a retainer can be a prepayment for all future services to be performed, amounting to a flat fee." *In re*

The W.D.N.Y. first described its practice of inquiring if an attorney was "fully retained" in *United State v. Zaccaria*, 1997 WL 642985 (W.D.N.Y. Apr.11, 1997). Two weeks before trial, defense counsel in *Zaccaria* had already billed services "in excess of the twenty-four hours provided for by the original retainer agreement." *Id.* at *2. Zaccaria, however, was unable to pay for past or future legal work because, unbeknownst to his counsel, Zaccaria had "borrowed the original retainer" and "did not have access to any additional funds." *Id.* Writing for the court, Judge Skretny stated:

> I am hard pressed to imagine that these same circumstances will arise with any regularity in the future. This district has taken affirmative steps to insure that counsel and their paying clients will discuss the scope of retainer agreements up front, and leave no questions unanswered as to the nature and extent of the representation and compensation. As I mentioned, the magistrate judges handling arraignments now ask about the retainer situation at the inception of the lawyer-client relationship, to insure

that both retained and retainor have no misconceptions. *Id.* at *4. Judge Skretny expressed the hope that this practice would prevent future cases involving "surprising financial revelations." *Id.*

In its original January 25, 2002 Order in the instant case, the district court briefly discussed the Western District's practice. Citing Judge Skretny's discussion in *Zaccaria*, Chief Judge Arcara noted:

> As counsel is aware, this district has a practice of inquiring into whether counsel has been "fully retained" for the purposes of all the proceedings in the case. The purpose of this practice is to ensure that counsel and their paying clients have discussed the scope of the retainer agreement and the extent of representation "up front" so as to avoid a situation where counsel discovers on the eve of trial that the funds have been exhausted.

Likewise, in its March 4, 2002 Order, the district court briefly mentioned the practice: "It is the Court's practice to inquire into the fee arrangement with retained counsel so as to avoid just this situation.

---

*Equip. Servs., Inc.*, 290 F.3d at 746. "Under either one of these arrangements, the attorney acquires title to the retainer fee at the time he receives it, regardless of whether he thereafter performs legal services for the client." *Id.* (citing *Indian Motocycle Assocs. v. Mass. Hous. Fin.*, 66 F.3d 1246, 1254 (1st Cir. 1995)). "On the other hand, if the relationship is a trust arrangement in which the attorney holds the retainer for the client as security for the payment of future fees, then the retainer so held, less any fees charged against it, constitutes the property of the client." *Id.* (citing *Indian Motocycle*, 66 F.3d at 1255); *cf. In re Hayes*, 183 F.3d 162, 173 (2d Cir.1999) (noting the validity of "retainers to pay for future services in which adjustments could be made as the actual services were performed").

Commentators have also distinguished between three types of retainers: (i) a "general

retainer"—"in which the client agrees to pay a fixed sum to the attorney in exchange for the attorney's promise to be available to perform, at an agreed price, any legal services (which may be of any kind or of a specified kind) that arise during a specified period"; (ii) a "nonrefundable retainer"—"a fee paid by a client in advance of services and denominated by the lawyer as nonrefundable, irrespective of whether the client discontinues the representation or whether the lawyer does any work"; and (iii) a "special retainer"—"in which the client agrees to pay the attorney a specified fee in exchange for specified services to be rendered" and "[t]he fee may be calculated on an hourly, percentage or other basis and may be payable either in advance or as billed." Lester Brickman & Lawrence A. Cunningham, *Nonrefundable Retainers Revisited*, 72 N.C.L. Rev. 1, 3–6 (1993).

As previously stated in the Court's January 25, 2002 Order, the purpose of the CJA is not to bail out an attorney who fails to make adequate fee arrangements before accepting representation."

In part because of the district court's relatively brief description of its own practice, we pointed out on Parker's first appeal that "nowhere in the record is the nature or scope of such a Western District practice set forth for our review." *Parker II*, 92 Fed.Appx. 26, 2004 WL 569275, at *1. We noted that, "although the [d]istrict [c]ourt cites Western District 'practice' in its opinions disposing of defendant's motion for appointment of counsel, those opinions neither elaborate on the nature or justifications for the referenced practice, nor directly address the compatibility of such a practice with the CJA." *Id.* (citations omitted). As a result, we vacated the district court's order denying CJA relief and remanded the case to the district court "to consider the compatibility of Western District custom and practice with the requirements of the CJA." *Id.* at *2.

On remand, the district court, in response to our request for explication of the policy, described the nature of the "fully retained" inquiry. The court explained:

This District has a practice of asking retained counsel during his or her initial appearance in a criminal case whether he or she is "fully retained" for the entire case. The practice consists of simply asking retained counsel whether counsel is "fully retained." If counsel responds affirmatively, the inquiry ends there. However, if counsel states that he or she is not fully retained, the Court will not permit counsel to appear until such a representation can be made.

By asking counsel whether he or she is "fully retained," the Court is asking counsel whether he or she agrees to represent the defendant for the duration of the criminal proceedings in the district court. This practice was developed to prohibit an attorney from trying to limit his representation of a defendant to only a discrete stage of the criminal proceedings, as has occurred in the past. For example, an attorney would seek to appear as "partially retained," meaning that he was retained to represent the defendant *only* for the detention hearing, or *only* for a suppression hearing, or *only* to negotiate a plea agreement. Counsel would then accept an undisclosed partial retainer fee that was sufficient to cover only that particular service for which he or she was retained. When the retainer fee ran out, counsel sought to withdraw or be appointed under the CJA claiming that the defendant did not have sufficient funds to retain counsel for the duration of the criminal proceedings.

*Parker III*, 2004 WL 2095684, at *9. The district court also described the purpose of this practice:

This District's practice of inquiring into whether an attorney has been "fully retained" serves to put defense counsel on notice at the outset that he will not be permitted to appear only for a limited purpose, and that if he undertakes representation of a criminal defendant, he will be expected to do so until the matter is terminated in the district court. The practice is intended to ensure continuity in representation to the defendant. If the retainer fee runs out, counsel will not be permitted to withdraw simply because his client is unable or refuses to pay.

*Id.* at *10. An affirmative response to the "fully retained" inquiry, therefore, is not a representation that an attorney has been fully paid but only that an attorney is not entering an appearance for a "limited pur-

pose." *Id.*[19] After explaining the nature and purpose of the "fully retained" inquiry, the district court concluded that this practice was entirely consistent with the CJA.[20]

Surprisingly, in debating the compatibility of the district court's practice with the CJA, neither of the parties discusses (or even cites to) the Criminal Justice Act Plan for the Western District of New York, which was promulgated pursuant to § 3006A(a). However, the W.D.N.Y. CJA Plan, which defendant does not challenge, is directly relevant to our inquiry. In addressing the appointment of counsel, the Plan states:

> At any stage of the criminal proceedings, upon finding that the person is financially unable to continue to pay retained counsel, the Court may make an appointment of counsel in accordance with the general procedure set forth in this Plan. *This proviso does not, however, relieve retained counsel from either his/her contractual obligations under the retainer agreement or his/her obligations under the Code of Professional Responsibility. Also, this proviso does not alter the mandate of the Local Rules which require leave of Court to with-*

---

**19.** *But cf. Matter of Mason*, 208 A.D.2d 1, 6, 621 N.Y.S.2d 582 (1995) (suggesting that defense counsel used the phrase "fully retained" to mean "that the client had not paid the entire amount due and thus that [defense counsel] was not yet obligated to render services").

**20.** As noted above, in its original Order of January 25, 2002, the district court, in considering Parker's motion to appoint Mahoney as CJA counsel, utilized language suggesting that mid-case appointment could occur only under "sufficiently unusual and extenuating" circumstances. The W.D.N.Y. first used this language in *Herbawi* when a magistrate judge granted defense counsel's request to be relieved as retained counsel. 913 F.Supp. at 172–73. The judge held that, "[w]hile the defendant's default in paying the balance due on a fee agreement may not, in and of itself, ordinarily be sufficient to warrant appointment under the CJA," the circumstances of defense counsel's application in this case are *"sufficiently unusual and extenuating* as to justify relief." *Id.* at 172 (emphasis added). In *Zaccaria*, the district court also utilized this language, but this time in the context of a motion for mid-case appointment under 18 U.S.C. § 3006A(c). 1997 WL 642985, at *1. The court determined that the defendant's situation was "sufficiently unusual and extenuating as to justify relief," *id.* at *2 (quoting *Herbawi*, 913 F.Supp. at 172), because "the failure of the retainer agreement was the product of miscommunication and unarticulated expectations, and not any scheme to circumvent the CJA or unjustly enrich defense counsel," *id.*

The district court's decisions leave undefined the precise meaning of "sufficiently unusual and extenuating" circumstances. We believe, however, that insofar as this language narrows the scope of the "interests of justice" determination under 18 U.S.C. § 3006A(c), such a standard is incompatible with the standard enumerated in the statute, which permits a mid-case appointment "as the interests of justice may dictate." 18 U.S.C. § 3006A(c); *cf. United States v. Hunter*, 394 F.Supp. 997, 999–1000 (D.D.C.1975) (rejecting an "extraordinary circumstances" requirement for § 3006A(d) because it is not compelled by the statute's language and may impede the legislative goal of furnishing indigent defendants with competent attorneys). Accordingly, we note that, in deciding whether to authorize CJA appointment under § 3006A(c), a magistrate judge or district court need not find "sufficiently unusual and extenuating" circumstances if the "interests of justice" dictate mid-case appointment.

However, after we vacated the district court's initial decision and remanded for further proceedings, the district court explicitly based its new decision on the "interests of justice" standard without reference to the necessity of "sufficiently unusual and extenuating" circumstances. As a result, the district court's earlier language regarding "sufficiently unusual and extenuating" circumstances is irrelevant for determining on this appeal whether the district court's "fully retained" inquiry is compatible with mid-case appointment under the "interests of justice" standard.

*draw once a notice of appearance has been entered.*

W.D.N.Y. CJA Plan, at *9 (Part XI.M) (emphasis added). In light of this explicit policy regarding retainer agreements, the considerations underlying the policy, and the actual manner in which the Western District implements that policy, we conclude that the "fully retained" inquiry does not impair the authorization of mid-case appointment. The district court's practice of ensuring that a criminal defense attorney is "fully retained" is supported by (i) the applicable rules of professional responsibility; (ii) the concern for preventing abuses of CJA resources; (iii) the fact that mid-case appointments occur in the W.D.N.Y. (as it did in this case), coupled with the utter lack of evidence indicating a pattern of disallowing these appointments, and (iv) the numerous disadvantages, as the American Bar Association points out, of allowing partial representation.

First, the W.D.N.Y. CJA Plan expressly incorporates the Local Rules of the Western District of New York ("W.D.N.Y. Local Rules") and the Code of Professional Responsibility ("Code"). *See id.* The W.D.N.Y. Local Rules, as well as the Code, permit an attorney who has appeared as the attorney of record for a party to withdraw only for "good cause." W.D.N.Y. Local R. Civ. P. 83.2(c) (incorporated by reference in W.D.N.Y. Local R.Crim. P. 57.2); *see also* N.Y.Code of Prof'l Responsibility D.R. 2–110(A)(1) ("If permission for withdrawal from employment is required by the rules of a tribunal, a lawyer shall not withdraw from employment in a proceeding before that tribunal without its permission.").

A client's refusal to pay attorney's fees may constitute "good cause" to withdraw. *See, e.g., McGuire v. Wilson,* 735 F.Supp. 83, 84 (S.D.N.Y.1990) (collecting cases). In most cases, however, courts have per-

mitted counsel to withdraw for lack of payment only where the client either "deliberately disregarded" financial obligations or failed to cooperate with counsel. *Id.* "Non-payment of legal fees, without more, is not usually a sufficient basis to permit an attorney to withdraw from representation." *In re Albert,* 277 B.R. 38, 50 (Bankr.S.D.N.Y.2002) (quoting *In re Revere Armored, Inc.,* 131 F.3d 13, 1997 WL 794460, at *3 (2d Cir. Dec.30, 1997) (unpublished decision)). Moreover, the exhaustion of a retainer is not evidence of a deliberate violation. *See In re Meyers,* 120 B.R. 751, 753 (Bankr.S.D.N.Y.1990).

"New York State courts interpreting the Code of Professional Responsibility have reached similar results." *McGuire,* 735 F.Supp. at 84 (collecting cases). Indeed, the disciplinary rules of the Code permit a lawyer to withdraw from representing a client for the non-payment of fees only if the client *"[d]eliberately disregards* an agreement or obligation to the lawyer as to expenses or fees." N.Y.Code of Prof'l Responsibility D.R. 2–110(C)(1)(f) (emphasis added). Moreover, the ethical considerations of the Code advise that the "[f]ull availability of legal counsel requires ... that lawyers who undertake representation complete the work involved." *Id.* at E.C. 2–31; *see also id.* at E.C. 2–32 ("A decision by a lawyer to withdraw should be made only on the basis of compelling circumstances and, in a matter pending before a tribunal, the lawyer must comply with the rules of the tribunal regarding withdrawal.").

"There is little question that a defendant's failure to pay fees may cause some divisiveness between attorney and client, but we presume that counsel will continue to execute his professional and ethical duty to zealously represent his client, notwithstanding the fee dispute." *O'Neil,* 118 F.3d at 71. Here, Mahoney did not seek

to withdraw from defending Parker and should be commended for his perseverance and dedication to his client. However, the district court's "fully retained" inquiry goes no further than the relevant caselaw interpreting the Code: neither the inquiry nor the caselaw allows mid-case withdrawal or additional compensation solely because of a client's nonpayment of fees or counsel's exhaustion of a retainer. Thus, the applicable standards of professional responsibility militate in favor of ensuring continuity of representation, which the district court's practice promotes.

Second, contrary to defendant's contentions, it is conceivable that the "fully retained" inquiry also may prevent certain potential abuses of the CJA system. "We share the district judge's concern for preserving the integrity and preventing abuses of the CJA program." *United States v. Crosby,* 602 F.2d 24, 29 (2d Cir.1979). The Western District's CJA Plan specifies that in the normal case the court will "direct the Federal Public Defender Office to appoint counsel from the CJA Panel." W.D.N.Y. CJA Plan, at *8 (Part XI.B). The Plan expressly prohibits a defendant from "select[ing]" a particular attorney from the Federal Public Defender's Office or the Trial Panel or from the Appellate Panel." *Id.* at *9 (Part XI.I).

The "fully retained" inquiry protects these rules by preventing attorneys from using their initial appearances as retained counsel to secure CJA appointments outside the Plan and by preventing defendants from entering unrealistic retainer agreements to circumvent the Plan's prohibition against selection of a particular CJA attorney. *Cf. Green v. Abrams,* 984 F.2d 41, 47 (2d Cir.1993) (holding that "an indigent defendant has no right to choose the particular counsel appointed to represent her"); *United States v. Iles,* 906 F.2d 1122, 1130 (6th Cir.1990) (noting that "[t]he

right to counsel of *choice,* unlike the *right* to counsel ... is not absolute"). The "fully retained" inquiry also protects the CJA's limited funds by discouraging a few opportunistic attorneys from utilizing substantial partial retainers that, after quickly being exhausted, would then require the use of CJA funds.

Third, defendant's argument that the "fully retained" inquiry is necessarily incompatible with 18 U.S.C. § 3006A(c) is also unconvincing for, in this case, as in several other cases in the Western District of New York, counsel actually received a mid-case appointment. *See Parker III,* 2004 WL 2095684, at *5 n. 11 & *8 (pointing out that Mahoney received approximately $19,748.52 in CJA funds following his mid-case appointment); *see also Zaccaria,* 1997 WL 642985, at *2–3 (granting mid-case appointment under § 3006A(c) for a defendant who paid a retainer that was subsequently exhausted); *cf. Herbawi,* 913 F.Supp. at 173 (granting mid-case relief for retained counsel and provisionally appointing counsel pursuant to § 3006A pending determination of the defendant's application for assigned counsel).

Parker's argument that the local rule is not compatible with the CJA simply because the rule is "not always enforced" is without merit. Parker adduces no evidence of a W.D.N.Y. pattern or practice of automatically denying mid-case appointment under § 3006A(c). *Cf. Turpin v. Mailet,* 619 F.2d 196, 202 (2d Cir.1980) (holding that the "fatal weakness" of plaintiff's case was "his failure to prove any official policy" because "[t]here was no evidence of a prior pattern or practice"). Indeed, such a practice would run afoul of the Western District's local rule that permits an attorney to withdraw for "good cause." W.D.N.Y. Local R. Civ. P. 83.2(c) (incorporated by reference in W.D.N.Y. Local R.Crim. P. 57.2). This local rule

necessarily contemplates mid-case appointments to ensure the right to counsel for defendants whose counsel has withdrawn.

Fourth, and most importantly, defendant and his counsel fail to consider the potential disadvantages of a system of partial representation. Defendant argues that the "fully retained" inquiry is unnecessary because the W.D.N.Y. could address all of its concerns over potential abuse of the CJA system by either appointing different counsel as CJA counsel or adjusting the effective rate of compensation. Defendant contends that a system of "partial representation" (i.e., allowing defense counsel to appear for only a particular stage of the proceeding) is more efficient than a system that requires only "fully retained" attorneys.[21]

Defendant's arguments, however, ignore a primary function served by insisting that an attorney who appears is "fully retained" for the course of the proceedings. Namely, requiring an attorney to be "fully retained" ensures that an attorney's litigation strategy is at all times a function of the client's best interest rather than an attorney's self-interest. A "fully retained" attorney, unlike an attorney who only enters an initial appearance, devotes his efforts to (in addition to staking his professional reputation on) each and every stage of the proceeding. He cannot transfer any preliminary professional errors to a subsequent attorney representing the client later in the proceedings. Moreover, "specialization in the various stages of a criminal proceeding" creates a risk, which is "greater in the case of indigents," of the "loss of the close confidential relationship between litigant and counsel." *Moore v. United States*, 432 F.2d 730, 736 (3d Cir. 1970); *cf. Doherty v. United States*, 404 U.S. 28, 33, 92 S.Ct. 175, 30 L.Ed.2d 209 (1971) (noting the Criminal Justice Act's "policy of providing blanket coverage of indigents' representation from arraignment through review by this Court") (Douglas, J., concurring).

Indeed, the American Bar Association Standards for Criminal Justice emphasize that "[c]ounsel initially provided should continue to represent the defendant throughout the trial court proceedings." A.B.A. Standards for Criminal Justice § 5–6.2. The ABA's commentary on this standard is especially insightful:

> This standard suggests that the attorney initially appointed to provide representation continue to do so throughout the trial proceedings. This affords the best opportunity for the development of a close and confidential attorney-client relationship. The standard thus rejects the practice in some public defender programs in which "stage" or "horizontal" representation is used, that is, different public defenders represent the accused at different stages of the proceedings, such as preliminary hearings,

---

**21.** Indeed, although citing no authority from this Court, the Supreme Court, or any other court, defendant requests that we expressly declare that the Sixth Amendment permits defendants to hire counsel for specific preliminary proceedings such as arraignment, detention, or preliminary hearings, and hold that this right may not be made contingent on defendant's ability to afford counsel for the duration of the proceedings. We believe that this type of partial representation, in addition to presenting several significant problems (discussed below), is not constitutionally required. *See Bourdon v. Loughren,* 386 F.3d 88, 100 (2d Cir.2004) (noting that "a defendant does not necessarily have a constitutional right to hybrid representation") (Oakes, J., concurring). Parker did not raise this contention in the district court, and we need not examine an issue that was neither argued nor decided in that court. *See United States v. Harrell,* 268 F.3d 141, 146 (2d Cir.2001) ("An issue is reviewable on appeal only if it was pressed or passed upon below.") (internal quotation marks and citation omitted).

pretrial motion hearings, trials, and sentencing. The utilization of stage representation in defender offices has developed due to the belief that it is cost-efficient and because it enables defenders to specialize and often reduces travel time and scheduling conflicts. The disadvantages of such representation, particularly in human terms, are substantial. Defendants are forced to rely on a series of lawyers and, instead of believing they have received fair treatment, may simply feel that they have been "processed by the system." This form of representation may be inefficient as well, because each new attorney must begin by familiarizing himself or herself with the case and the client must be reinterviewed. Moreover, when a single attorney is not responsible for the case, the risk of substandard representation is probably increased. Appellate courts confronted with claims of ineffective assistance of counsel by public defenders have commented critically on stage representation practices. The National Legal Aid and Defender Association—the only other national group to address this issue specifically—also has recommended that clients receive only one attorney throughout the trial proceedings.

*Id.* (commentary) (footnotes omitted).[22] The same concerns inform our view of a system in which partially retained counsel represents a defendant at one stage and then CJA appointed counsel represents the defendant at another. As the ABA points out, a system of partial representation damages the attorney-client relationship, dehumanizes the criminal justice system, requires duplicative legal services, and increases the risk of substandard representation. The W.D.N.Y.'s practice is thus not only consistent with the ABA Standards but finds substantial further support in considerations of fairness, efficiency, and judicial administrability.

■ "The acceptance of a client by a lawyer involves a complex set of professional and personal judgments." Gerald F. Uelmen, *Converting Retained Lawyers into Appointed Lawyers: The Ethical and Tactical Implications*, 27 Santa Clara L. Rev. 1, 4 (1987). Clearly, an attorney should make adequate arrangements with clients before accepting representation and before indicating that he is "fully retained." *See* N.Y.Code of Prof'l Responsibility E.C. 2–19. Under most circumstances, a lawyer considers whether representation of a client is "likely to result in an unreasonable financial burden on the lawyer" before accepting the client.

**22.** *See also* Chester L. Mirsky, *The Political Economy and Indigent Defense: New York City, 1917–1998*, 1997 Ann. Surv. Am. L. 891, 909–10 (1997) (describing the practice of "stage representation" and stating that "[r]eliance on stage representation reinforced the commitment of attorneys to case movement rather than to individual clients, and directly inhibited their capacity to provide adversarial advocacy in everyday cases"); Charles J. Ogletree, Jr., *Beyond Justifications: Seeking Motivations to Sustain Public Defenders*, 106 Harv. L. Rev. 1239, 1268 n. 112 (1993) ("The system of 'stage' representation utilized in many public defender offices, whereby attorneys are assigned to one particular courtroom and represent every defendant that appears there, further deprives defenders of the opportunity to form a meaningful bond with clients."); Suzanne E. Mounts, *Public Defender Programs, Professional Responsibility, and Competent Representation*, 1982 Wis. L. Rev. 473, 484 n. 56 (1982) ("Stage representation may have its own built-in inefficiencies that undermine its supposed cost effectiveness. For example, it will generally be necessary for each attorney to reinterview the defendant. There is also considerable inefficiency in a trial attorney preparing from a transcript of a preliminary hearing conducted by some other attorney.").

Uelmen, *supra*, at 4 (citation omitted). In certain cases, however, a change in a defendant's financial circumstances through job loss or another unforeseen calamity may prevent a defendant from paying retained counsel. Consequently, we note that the representation that counsel is "fully retained" should not be used as a factor against an applicant for mid-case appointment under the CJA.

■ Here, however, the relevant change in circumstances was not a change in defendant's financial circumstances—defendant continued to receive his salary until April 12, 2002—but rather a change in defendant's litigation strategy. At least under these circumstances, defendant's decision not to enter a plea and proceed to trial is not sufficient grounds for mid-case appointment. Thus, in light of the relevant ethical considerations, the potential abuses of the CJA, the uncontradicted evidence suggesting that the W.D.N.Y. allows mid-case appointments, and the disadvantages of partial representation, we find that the district court's "fully retained" inquiry is compatible with the authorization of CJA appointment under § 3006A(c), as long as mid-case appointment is permitted if the defendant is financially eligible and the "interests of justice" dictate.[23]

■ We are mindful that "[a]n affluent society ought not be miserly in support of justice, for economy is not an objective of the system." *Mayer v. City of Chicago*, 404 U.S. 189, 201, 92 S.Ct. 410, 30 L.Ed.2d 372 (1971) (Burger, C.J., concurring). We are equally mindful that, even under the Criminal Justice Act, which provides "one of the most generous compensation plans," the rates for appointed counsel are "low by American standards," *Argersinger*, 407 U.S. at 57 n. 21, 92 S.Ct. 2006 (Powell, J., concurring in the result), and the "nature of CJA practice" involves "long hours away from the office." *Fed. Trade Comm'n v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 415 n. 3, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990) (quoting *In re Superior Court Trial Lawyers Ass'n*, 107 F.T.C. 510, 522, n. 54 (1986)). As a result, we agree with one district court's observation that "[t]he statute must be construed and administered in a way which will encourage competent and dedicated attorneys to become involved in the federal criminal courts for, if caseloads and statistics are any guide, our need for such lawyers will continue in future years." *United States*

---

**23.** Defendant also requests that we disapprove of the use of public inquiries regarding the nature of private attorneys' retainers that could later foreclose appointment under 18 U.S.C. § 3006A(c) and that we mandate that these inquiries be completed on an ex parte basis. In *Harris*, we rejected a similar argument that "further inquiry" into the defendant's eligibility "should have been appropriately conducted through an ex parte, sealed in camera hearing." 707 F.2d at 662. We found that, "since Congress obviously knew how to provide for an ex parte proceeding when it seemed appropriate, the failure to do so in the context of appointment of counsel seems significant." *Id.* We also pointed out that "our legal system is rooted in the idea that facts are best determined in adversary proceedings; secret, ex parte hearings 'are manifestly conceptually incompatible with our system of criminal jurisprudence.'" *Id.* (quoting *United States v. Arroyo-Angulo*, 580 F.2d 1137, 1141 (2d Cir.1978)); *cf. United States v. Suarez*, 880 F.2d 626, 631 (2d Cir. 1989) (concluding that "the public has a qualified First Amendment right of access to the CJA forms after payment has been approved"). In any event, we decline to adopt a per se rule mandating ex parte review of retainer agreements when we customarily review similar rulings only for abuse of discretion, *cf. United States v. Schneider*, 395 F.3d 78, 92 (2d Cir.2005), especially where the issue was neither argued nor decided in the district court, *cf. Harrell*, 268 F.3d at 146.

*v. Hunter,* 394 F.Supp. 997, 1000 (D.D.C. 1975).

■ On the other hand, we also recognize that CJA funds are a necessarily limited resource, and that consequently we should avoid "an interpretation [that] would require use of public funds to pay the cost of counsel" for financially ineligible defendants. *United States v. Reddick,* 53 F.3d 462, 464 (2d Cir.1995). We are cognizant of the "public's strong interest in how its funds are being spent in the administration of criminal justice." *United States v. Suarez,* 880 F.2d 626, 631 (2d Cir.1989). We believe our construction of the statute is consistent with both adequately compensating appointed attorneys and prudently preserving CJA resources.[24]

The genius of the Constitution is that it recognizes that individual rights and liberties are essential ingredients of a just, free and ordered society. Thus, the legitimacy of a criminal conviction is in some part assured by the accused's right to an unfettered champion before the court. We have no doubt that counselor Mahoney represented defendant in this matter to the best of his ability. In executing that task, Mahoney performed an important and vital service to protect the rights of his client. Nevertheless, to stand before the bar in the Western District of New York and represent an accused is not the performance of a personal service contract. It is a

professional commitment to the rule of law among a free people.

## CONCLUSION

Accordingly, we conclude that the district court, after conducting an appropriate inquiry into defendant's ability to pay counsel whom he had retained, was not clearly erroneous in concluding that defendant was financially ineligible for mid-case appointment under 18 U.S.C. § 3006A(c) before April 12, 2002. We also conclude that the district court's practice of inquiring whether defense counsel is "fully retained" is compatible with the CJA as long as the district court allows mid-case appointment for eligible defendants as the "interests of justice" dictate. For the reasons stated above, the decision of the district court is hereby AFFIRMED.

---

**24.** As a result, we also reject Parker's contention that the "fully retained" inquiry constitutes an unconstitutional taking under the Fifth Amendment or "involuntary servitude" under the Thirteenth Amendment. U.S. CONST. amend. V; U.S. CONST. amend. XIII. We certainly recognize that Mahoney's CJA compensation of $19,748.52 for his post-trial work, limited as it was by the then-compensatory rate of $90 per hour for work performed on or after May 1, 2002, is not an accurate reflection of the quality of counsel Mahoney's efforts on Parker's behalf. We do not

believe, however, that $71,973.52 of "involuntary servitude," $52,225.00 of which resulted from a voluntary agreement and $19,748.52 of which resulted from public funds, constitutes a violation of either the Fifth or Thirteenth Amendments. In any event, we decline to address these issues as they were neither argued nor decided in the district court, *see Harrell,* 268 F.3d at 146, and only raised in a footnote on appeal, *see United States v. Svoboda,* 347 F.3d 471, 480 (2d Cir. 2003).