<u>**UNPUBLISHED**</u>

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 09-5096**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID A. HAGEN, a/k/a Antonio Diez, a/k/a David DeFusco,

Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte. W. Earl Britt, Senior District Judge. (3:08-cr-00093-WEB-2)

Argued: December 9, 2011　　　　Decided: March 12, 2012

Before AGEE, DAVIS, and KEENAN, Circuit Judges.

Affirmed by unpublished opinion. Judge Davis wrote the opinion, in which Judge Agee and Judge Keenan joined.

**ARGUED**: Philip Urofsky, SHEARMAN & STERLING, Washington, D.C., for Appellant. Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF**: David A. Brown, Richard Lee Edwards, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DAVIS, Circuit Judge:

Following a jury trial in May 2009, Appellant David A. Hagen was convicted of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371 ("Count One"); conspiracy to commit mail fraud and wire fraud, in violation of 18 U.S.C. § 1349 ("Count Two"); and conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956 ("Count Three"). The convictions arose out of Hagen's role in a so-called "pump-and-dump" securities fraud scheme, in which he and his co-conspirators acquired control of a company known as GTX Global, made successful efforts to artificially increase its stock price, and then sold the stock at a higher price, bringing in proceeds of approximately $27 million. The district court imposed consecutive sentences on each count of conviction summing to a 540-month term of imprisonment.

On appeal, Hagen contends that his convictions are tainted by the district court's erroneous refusal to appoint substitute counsel to represent him (and to postpone the trial in connection with the requested appointment of counsel) after his relationship with his retained counsel deteriorated. He also argues that the district court committed various errors at sentencing, including a miscalculation of the total loss that resulted from his offense behavior and an unreasonable failure to depart (or vary) from the Guidelines sentencing range. Having

2

carefully examined Hagen's contentions in the light of the record presented to us, and for the reasons that follow, we discern no reversible error; accordingly, we affirm the judgment.

## I.

### A.

At the time of the proceedings in this case, Hagen was an experienced financial fraud schemer, and the record suggests that deep knowledge of his background informed both his retained attorney's and the district court's handling of many of his pro se filings, requests, objections, and assertions of unfairness. Specifically, in 1990, Hagen was convicted of mail fraud and conspiracy to commit mail and wire fraud in the United States District Court for the Eastern District of Texas arising out of a fraudulent time-share marketing operation. Also, in early 1990 he was convicted of money laundering and conspiracy to commit bankruptcy fraud in the United States District Court for the Eastern District of Virginia. He was sentenced to a total of 100 months in prison on those convictions.[1] Hagen was released from federal prison in April 1997.

---

[1] See United States v. DeFusco, 949 F.2d 114 (4th Cir. 1991) (affirming conviction in E.D. Va.); United States v. DeFusco, 930 F.2d 413 (5th Cir. 1991) (affirming conviction in E.D. Tex.); see also United States v. DeFusco, No. 94-6144, 1994 WL 396351 (4th Cir. Aug. 1, 1994) (unpublished order affirming denial of relief under 28 U.S.C. § 2255).

3

In January 2007, following an extensive investigation, which included (among other techniques) interceptions of Hagen's telephone conversations with a co-defendant who was, unbeknownst to Hagen, cooperating with the government, the FBI filed a criminal complaint under seal charging Hagen with conspiracy to commit securities fraud and conspiracy to commit money laundering. The government's allegations were that Hagen, together with others, conducted a series of "pump-and-dump" securities fraud schemes in which they would buy stock in a company, make efforts to artificially increase its price, and then sell the stock at the elevated price. At the time the complaint was filed, Hagen had been living in the Bahamas since in or about March 2006.

In September 2007, he returned to the United States from the Bahamas, apparently in connection with an unsuccessful effort to become a diplomat for the Southern African nation of Swaziland and thereby avoid prosecution for potential criminal offenses and/or execution on civil judgments that had been entered against him.[2] Upon his arrival at JFK airport in New

---

[2] At trial Hagen described his efforts to become a diplomat for Swaziland as a way to secure "asset protection": "if you become a Consulate General of a Consulate of a diplomatic corps, they can no longer come in and attach your bank accounts." J.A. 1463. He also explained that he was "pursuing alternatives, which would include . . . a camouflaged passport, which basically gives you a new identity." J.A. 1466.

York, he was arrested and detained. At the time, he had been represented for some months (in connection with the government's investigation) by Kieran Shanahan, Esq., a North Carolina attorney whom Hagen had retained. In due course, Shanahan successfully negotiated a plea agreement with the government on Hagen's behalf and Hagen signed the plea agreement on October 22, 2007. The plea agreement called for Hagen's cooperation with the government's ongoing investigation. Pursuant to the plea agreement, Hagen and counsel met with government investigators and prosecutors and Hagen made numerous disclosures and admissions demonstrating his knowing involvement in the "pump-and-dump" conspiracy.[3]

---

[3] A critical (and rather unusual) feature of the plea agreement executed by Hagen provided that upon his breach of the agreement, the government would be permitted to use against Hagen "any and all information, in whatever form" Hagen had provided to the government:

> In any such prosecution, the prosecuting authorities, whether federal, state, or local, shall be free to use against him, without limitation, any and all information, in whatever form, that he has provided pursuant to his plea agreements or otherwise. The defendant shall not assert any claim under the United States Constitution, any statute, Fed.R.Crim.P. 11(f), Fed.R.Evid. 410, or any other provision of law, to attempt to bar such use of the information. . . .

> The defendant acknowledges that Federal Rule of Criminal Procedure 11(f) and Federal Rule of Evidence 410 are rules which ordinarily limit the admissibility of statements made by a defendant in the course of plea discussions or plea proceedings if a guilty plea is later withdrawn. The defendant knowingly and

(Continued)

There followed several postponements of the scheduled guilty plea proceedings, ostensibly due to defense counsel's scheduling conflicts. By December 2007, however, Hagen had discharged Shanahan as his counsel upon Hagen's learning that Shanahan had worked as an Assistant United States Attorney in the U.S. Attorney's Office for the Eastern District of North Carolina while Sam Currin, Esq., one of Hagen's co-defendants, served as the United States Attorney in that district. Shanahan filed a motion to withdraw, which the district court granted on December 4, 2007. That same day Steven Meier, Esq., whom Hagen's wife had retained, entered his general appearance. Hagen soon decided not to go forward with his long-anticipated guilty plea. Accordingly, a federal grand jury returned an indictment against Hagen and others on April 23, 2008.

---

voluntarily waives the rights which arise under these Rules. As a result of this waiver, he understands and agrees that any statements which are made in the course of his guilty plea or in connection with his cooperation pursuant to this plea agreement will be admissible against him for any purpose in any criminal or civil proceeding if his guilty plea is subsequently withdrawn.

S.J.A. 29, 31. After a hearing, the district court granted the government's motion in limine and admitted at trial Hagen's admissions of his knowing participation in the charged conspiracies. Hagen does not challenge on appeal the district court's ruling in this regard.

In light of Hagen's assertion that the combination of his counsel's lack of diligence and the district court's acquiescence in such deficient performance (by failing to appoint successor counsel) denied Hagen a fair trial, we set forth in some detail the pre-trial proceedings that took place below.

A magistrate judge held an initial appearance on May 8, 2008, at which Attorney Meier asked to be heard on the issue of his representation of Hagen. Meier explained that although Hagen had paid a "not insubstantial retainer" to Meier's firm, it had been negotiated under the belief Hagen was likely to plead guilty. According to Meier, because Hagen had declined to plead guilty and had withdrawn his consent to, and declined to perform his obligations under, the plea agreement, and because of the complexity of the case and the large number of documents involved, the retainer was going to "run short pretty quickly," and there was "some question" as to whether Hagen would have any funds to pay Meier in that event, as Hagen's funds had been frozen as subject to forfeiture. Thus, Meier requested permission to file an affidavit to demonstrate Hagen's indigence and explain the status of the retainer. The government did not specifically oppose the request, but stated its "concern" that "once someone has been paid a retainer, it's difficult to be

appointed." The magistrate judge stated that Meier could file such an affidavit if he so wished. No such affidavit ever was filed, however.

Approximately four weeks later, on June 3, 2008, the magistrate judge conducted an arraignment, detention and bond review hearing. S.J.A. 80-111. Meier again brought up the issue of his representation of Hagen. He explained that he expected to face "somewhere between 500,000 and upwards of 22 million pages of discovery," but had received only "partial payment" of his retainer. S.J.A. 102. Meier asked for the magistrate judge's "guidance on that," later clarifying that "ultimately" his request was to be appointed as Hagen's counsel under the Criminal Justice Act ("CJA"), once the retainer Hagen had previously paid had been exhausted. S.J.A. 103-04. Meier recognized that such an appointment would be unusual, but stated that given the "extraordinary amount of discovery" and the likely need for investigators, expert witnesses, and depositions, his representation of Hagen presented an "extraordinary situation." S.J.A. 104.

In response to these expressions of concern by Meier, the magistrate judge explained that although appointing counsel who had previously been retained would be a "great departure," he appreciated the situation in which Meier found himself. Thus, he

8

stated, "If you want to make a motion at some point, I'll be glad to address it." S.J.A. 104, 110.

Meier never filed a motion to be appointed under the CJA as Hagen's counsel. Nor did Meier seek funds for investigative and related services, as presumably he would have been entitled to seek under 18 U.S.C. § 3006A(e)(1).[4] Indeed, during a telephone conference with the presiding district judge on June 12, 2008, no mention was made of the possibility that Meier might move to be appointed or seek reimbursement for investigative and other expenses. The parties and the court agreed to set May 4, 2009, as a firm date for trial. Another nearly ten months went by, during which Meier filed a number of pretrial motions on Hagen's behalf, including motions to suppress evidence, and he responded to the government's motions in limine, and during which the

_____

[4] Section 3006A(e)(1)(e) provides as follows for investigative or other services:

> Services other than counsel.--
>
> (1) Upon request.--Counsel for a person who is financially unable to obtain investigative, expert, or other services necessary for adequate representation may request them in an ex parte application. Upon finding, after appropriate inquiry in an ex parte proceeding, that the services are necessary and that the person is financially unable to obtain them, the court, or the United States magistrate judge if the services are required in connection with a matter over which he has jurisdiction, shall authorize counsel to obtain the services.

18 U.S.C. § 3006A(e)(1).

grand jury returned a second superseding indictment on February 19, 2009.

On March 26, 2009, five and a half weeks before trial, Hagen filed a pro se motion to discharge Meier. He lodged numerous complaints regarding Meier's representation, including that Meier had not filed pre-trial motions that Hagen had requested that he file; that he failed to "professionally assess" Hagen's "culpability" and "bargaining position"; that he had not interviewed certain "relevant participants and witnesses"; and that he had not filed a motion to suppress that Hagen had requested that he file. Hagen explained that he had prepared a "97-page Trial Guide" describing how he wished Meier to proceed with "every aspect of the case," but Meier had not followed his instructions. J.A. 158. Thus, he requested that the court permit him to proceed pro se, "[o]r, in the alternative . . . in recognition of his indigence . . . appoint a suitable defense counsel." J.A. 165.

A few days later, Meier filed a motion to withdraw. In light of Hagen's motion to discharge Meier, Meier stated, "various conflicts and irreconcilable differences have arisen between counsel and Defendant making counsel's continued representation of Defendant impossible." J.A. 170. Neither Meier nor Hagen requested a continuance, however.

The district court held a hearing on Hagen's and Meier's motions on April 6, 2009, one month before the long-scheduled trial date. The court addressed Hagen, stating, "obviously [you and Meier] have some differences of opinion as to how best for him to go about representing you," although "that's not unusual." J.A. 174. The court noted, however, "I don't know what the problems are between you and your lawyer." Id. The court explained to Hagen the perils of proceeding pro se, but acknowledged, "if that's what you want to do, you are entitled to do it." J.A. 176. Hagen responded by reiterating his complaints about Meier's representation. He then requested leave to proceed pro se, although he acknowledged that preparing for trial from detention in the local jail in this document-intensive case would be extraordinarily difficult. Alternatively, he requested that an attorney be appointed to replace Meier, noting that he could no longer afford to pay an attorney.

For his part, Meier explained to the court that the retainer Hagen had paid would soon run out, but that he had assured Hagen that he would "honor [his] commitment to represent him regardless," even knowing Hagen was unlikely to pay subsequent costs. J.A. 179. The government, for its part, also countered Hagen's accusations against Meier, describing the extensive work Meier had done on the case -- work of which Hagen

11

almost certainly was not aware -- including multiple exchanges with the government about discovery, the law, and the facts. Moreover, although Hagen had complained that Meier had not filed a motion for discovery, the government explained there was no need for such a defense motion because the government had already "provided open file" discovery in the case. J.A. 187.

The district court stated, "I don't want to get into a swearing match between you [Hagen] and your lawyer and I'm not going to do that." J.A. 178. With respect to the witnesses Hagen believed Meier should have subpoenaed, the court explained to Hagen, "If you tell [Meier] to subpoena whatever witnesses to come and testify on your behalf, he'll do that." Id. When Hagen complained again that Meier's performance had been inadequate, the court stated, "That's beyond the point. I'm not going to continue this trial." J.A. 181. "We're going to start a month from today one way or the other." Id. "If I were to give you another year, if I were to continue the case to give you longer to be prepared, without any legal training you will not be able to do it." J.A. 182.

Hagen then reiterated his request, as an alternative to proceeding pro se, that the court allow Meier to withdraw and then appoint "somebody who will be competent in my representation." J.A. 183. In response, the court stated that even "assuming" Hagen could prove that he was "now indigent,"

12

> [I]f I were to allow you to discharge Mr. Meier[,] . . . appoint another lawyer and continue the case, it would take six months for that lawyer to get up to snuff and be ready for trial. Now, at the end of that six months I'll be having another motion before me by David Hagen wanting another lawyer because that lawyer too does not want to do it like you want it done. . . . You've had two privately retained lawyers now that you can't get along with and you want the court to appoint you a third one, and I'm not going to do it. I'm going to deny the motion, both motions. You either make peace with your lawyer or, Mr. Meier, when we go to trial a month from today, if Mr. Hagen insists on going pro se, you'll be standby counsel.

Id. Meier reiterated his concern that Hagen's complaints about Meier's performance had created an "extraordinary conflict of interest," but stated that even if Hagen were to proceed pro se, he would be willing to serve as standby counsel and assist Hagen with subpoenas and other "things of that nature." J.A. 185. Finally, the government expressed its opposition to Hagen's request to proceed pro se, because providing discovery to the defendant while he was incarcerated in the Mecklenburg County Jail would be "a huge logistical nightmare." Id.

After engaging in an extended colloquy with Hagen to confirm that his decision to proceed pro se was knowing and voluntary, the court granted the request. The court denied Hagen's request for appointed counsel, largely because it would be "impractical, impossible, and a travesty to this court's time and the efforts that have been put into this case over the last two-and-a-half years to delay further the trial of this action," which the court concluded would have been necessary if it were

13

to appoint new counsel. J.A. 199-200. Importantly, the court also denied Meier's motion to withdraw. Rather, Meier was instructed to remain as standby counsel, to continue to prepare for trial, and "in terms of trial preparation" to "act on Mr. Hagen's orders." J.A. 203.

When Hagen again argued that Meier had been ineffective, the court stated, "I don't know how much communication you and he have, that's between the two of you," but did observe that the government had represented that Meier had done "everything any defense counsel would be doing up until this point." J.A. 204. The court entered an order allowing Hagen to proceed pro se at trial and instructing Meier to "continue preparing for trial as if he were trying the case" and to "remain in the case as standby counsel for trial to assist defendant if and when and to the extent called upon by defendant." J.A. 171A. Hagen filed a motion for reconsideration, which the district court denied.

During a status hearing before a magistrate judge on April 23, 2009, a week and a half before the trial date, Meier described the tasks he had undertaken on Hagen's behalf. He had offered to Hagen to have his office type any motions he wished to file, "even to the extent that they reflect negatively upon me." J.A. 235. Notably, Meier explained he would be prepared for trial, and had instructed his staff to accept any call from Hagen. In addition, the government explained some of what it had

14

undertaken to do in order to address some of Hagen's concerns. For example, it had waived its usual policy of prohibiting defense counsel from leaving discovery materials with defendants who are detained, and had created binders of trial exhibits which it sent to Meier to provide to Hagen. Hagen reiterated some of his complaints about Meier's representation but noted that ever since the district judge granted the motion to proceed pro se, "the cooperation did go way up," and he was "comfortable that we are now moving, at least, in a direction that I can at least communicate with [Meier and his staff]." J.A. 261. "[N]ow -- he is indeed, he is sending his person over, I spent about 2 hours a day with him the last three days." Id. With respect to Hagen's difficulties preparing for trial without a private cell or access to the prison library, the magistrate judge instructed the Marshals Service to communicate to the Mecklenberg County Jail that Hagen was going to trial in a week and would be representing himself, and to instruct the jail "to make sure that he's getting adequate access to what he needs." J.A. 277.

On May 4, 2009, the first day of trial, Hagen again objected to "the unfair and unjust manner in which I've been forced to proceed pro se" and requested a continuance. Id. The district court explained that Hagen could, at any time before or during the trial, ask Meier to step in to represent him, although he could not "go back and forth." J.A. 303. Hagen then

15

explained that he had decided to accept Meier's representation, though "under duress." J.A. 305. He argued the court should not force him to choose between proceeding with Meier and proceeding pro se. But given what he saw as an "unconscionable" choice, Hagen agreed to proceed represented by Meier. J.A. 311. The court then heard argument on several motions in limine. Meier made detailed arguments on each. Trial began the next day.

## C.

Over the course of the two-week trial, Meier gave an opening statement and vigorously cross-examined the government's witnesses, including investigating agents, cooperating co-conspirators, and an expert on securities trading. He also conducted a direct examination of Hagen that took several hours, made a number of arguments about jury instructions, and gave an extensive and detailed closing argument. Indeed, after the jury retired to deliberate, the district court commended counsel for both parties "for the very professional way in which [they] carried out [their] duties" and for being "well versed" in the facts and the law. S.J.A. 434. The court specifically commended Meier for his grasp of complex questions of stock trading and his cross-examination of the government's expert witness.

### 1.

Briefly summarized, the evidence at trial showed the following. Hagen owned a company known as Gatelinx Corporation

16

that was working to develop software for secure online video communications. Gatelinx, in turn, owned another company that marketed satellite television subscriptions for Direct TV and employed 90 to 100 people in a call center. Gatelinx's revenue was almost entirely derived from those marketing operations, as Hagen admitted at trial. In 2004, Gatelinx's contract with Direct TV was terminated. Gatelinx was left without a revenue stream, and began to "run out of money"; Hagen "could see the end coming" for Gatelinx. J.A. 1212, 1389.

Hagen started looking for other sources of revenue. In late 2004, one of Hagen's co-conspirators, Howell Woltz, proposed a reverse merger between Gatelinx and a publicly held shell company called autoleasecheck.com, which was listed through Pink Sheets, an electronic quotation system that displays quotes from broker dealers for certain "over-the-counter" securities. This would allow Gatelinx to sell shares to the public but avoid many of the disclosure requirements that apply to initial public offerings. Hagen and Woltz executed the reverse merger and renamed the merged company GTX Global Corp. ("GTX Global" or "GTX"). At that point, Hagen and his co-conspirators controlled approximately 91.4 percent of the company's 31,150,000 outstanding shares of stock, or approximately 28.5 million shares, which they held through several offshore companies.

17

Eventually, Hagen and his co-conspirators agreed on a plan to begin selling GTX shares to the public through Canadian brokerage firms and fraudulently "pump" up the stock price and trading volume by engaging in a fraudulent promotional campaign. Their goal was to drive the stock price from $4 to over $20 and then to "dump" the stock, keeping the proceeds. They began the promotional campaign in October 2005, primarily by creating websites that fraudulently touted the company's business prospects and misstated the company's financial condition. For example, one press release described GTX Global as a "[f]inancially stable company with strong balance sheet," "an established leader in direct response marketing, with average annual sales over $12 million, de[ri]ved primarily from sales of residential satellite television services," which was "utilizing these marketing capabilities to launch proprietary patented video conferencing software technology," on which it held "numerous patents." J.A. 597-99. The release continued, "By the end of 2007, sales are expected to hit nearly [$]360 million, with earnings of [$]64 million." J.A. 600. In reality, although the company had begun developing software for online video communications, the company did not own any patents, had not completed development of any software, had no customers, and, having lost the Direct TV contract, had no revenue. At times, the company did not even have funds to pay its electric bill.

18

The conspirators also issued press releases designed to mislead the public into believing that Hagen, who (as previously mentioned) had twice previously been convicted of federal fraud felonies, was not involved in the management of the company, and that no one person controlled more than 5 percent of the company's stock. In addition, one of GTX's lead software developers had stolen a copy of the code for the software the company had been developing. Hagen and the others decided not to disclose that theft to investors. Moreover, throughout this period, Hagen and his co-conspirators took steps to avoid detection of the scheme, including by working to prevent the price from rising "too fast, because it would attract regulatory attention." J.A. 591.

In the months before the promotional campaign began in October 2005, no shares of the company had been traded. During the "pump" phase of the scheme, the trading volume skyrocketed, up to 500,000 shares per day, as did the share price, up to $10 per share in December 2005. Within two months, the conspirators sold over half of their holdings, or a total of approximately 14 million shares. By August 2006 Hagen and the others had sold approximately 19 million GTX shares to the public, generating proceeds of between $32 and $35 million. Although they re-invested approximately $2 million in the company, the remaining proceeds went into the "pocket[s]" of Hagen and his co-

19

conspirators. J.A. 554. Hagen's percentage share of the proceeds was 22.4 percent. Approximately $27.6 million of the approximately $32 to $35 million they had derived from the sale of GTX stock were wired from the Canadian brokerage firms to bank accounts in the Bahamas, Curacao, Panama and Cyprus, among other places, that were held by Hagen and his co-conspirators.

The promotional campaign continued until in or about June 2006. By mid-August 2006, the share price dropped to approximately $1, and continued to drop after that. One investor testified that on February 13, 2006, he bought 1,000 shares for $7.09 per share, shares he sold later, just to get them "off the paperwork," for 0.06 cents per share. J.A. 1099. Another investor testified that on June 9, 2006, having read the promotional materials, he bought 3,000 shares of GTX stock at $3.31 per share. By the time of Hagen's trial, the entire investment -- all 3,000 shares -- was worth just 75 cents. The stock price had dropped to just 0.025 cents per share.[5]

2.

After the two-week trial, and after deliberating for thirty-three minutes, the jury returned guilty verdicts on all counts: conspiracy to commit securities fraud; conspiracy to

---

[5] By that time the company had changed its name again, this time to Vision Technology Corporation. That company filed for bankruptcy in February 2007.

20

commit mail fraud and wire fraud; and conspiracy to commit money laundering. After the jury returned the verdicts, the district court instructed the jury to deliberate on a requested special forfeiture verdict. The jury was instructed to determine "the amount of money representing the criminally derived proceeds, if any, which the defendant himself received directly and/or which he received indirectly, due to the reasonably foreseeable conduct of his co-conspirators." J.A. 1768. The court defined this amount as "property that the defendant and other conspirators would not have received, but for their involvement in the conspiracy." Id. The jury found this amount to be $27.6 million.

D.

The court held a sentencing hearing on November 2, 2009. The primary issue at sentencing was the amount of loss caused by the fraud. The probation officer who prepared the Pre-Sentence Report ("PSR") determined that an upward adjustment for a loss more than $20 million should apply, resulting in a 22-level upward adjustment. The basis for that upward adjustment was the jury's finding that the proceeds received as a result of the conspiracies were $27.6 million. Hagen objected, contending the correct loss amount for Guidelines purposes was $15,160.38, corresponding to just a 4-level upward adjustment. The district court overruled Hagen's objection, and adopted the PSR's

21

recommendation of a 22-level increase based on loss. The court also concluded that the offenses of conviction were to be grouped for Sentencing Guidelines purposes, and applied the Guidelines section applicable to money laundering offenses, which was the Guideline that carried the sentence with the longest term of imprisonment: life. Having calculated the advisory Guidelines ranges, the district court imposed terms of imprisonment of five years on Count One, twenty years on count Two, and twenty years on Count Three, each corresponding to the statutory maximum on each count and to be served consecutively, for a total of forty-five years in prison.

E.

Hagen timely appealed. On appeal, he argues he is entitled to a new trial for two reasons: because the district court should have appointed counsel and permitted Meier to withdraw, and in any event because the court should have granted a continuance to permit Hagen to fully prepare a pro se defense. Alternatively, he seeks a re-sentencing, for two reasons: because the district court applied the Guideline for money laundering convictions rather than the Guideline for mail fraud convictions, and because the district court erred in calculating the loss attributable to the stock fraud scheme. As we explain within, we reject each of these contentions.

22

II.

Hagen's first argument on appeal is that the district court abused its discretion in denying his motion to discharge his privately retained lawyer, Meier, and to replace him with a court-appointed lawyer. He argues he was entitled to appointment of counsel both by virtue of the Sixth Amendment right to adequate representation and the Criminal Justice Act, 18 U.S.C. § 3006A. For the following reasons, we hold the district court did not abuse its discretion in denying Hagen's motion.[6]

A.

We first consider Hagen's claim under the Sixth Amendment, which provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. In cases where a district court has denied a request by a defendant to replace one court-appointed lawyer with another court-appointed lawyer, we consider three factors to determine whether the initial appointment "ceased to constitute Sixth Amendment assistance of counsel": "(1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) 'whether the

---

[6] Although prior to trial Hagen also requested to proceed pro se, immediately before trial he elected to re-assert his right to counsel and have his attorney represent him at trial. Thus, on appeal we are not faced with a denial of a defendant's right to proceed pro se, and Hagen does not so contend.

attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense.'" United States v. Smith, 640 F.3d 580, 588 (4th Cir. 2011) (quoting United States v. Gallop, 838 F.2d 105, 108 (4th Cir. 1988)).

In United States v. Mullen, 32 F.3d 891 (4th Cir. 1994), we applied those same factors in an appeal, after a jury verdict of guilty, from the denial of a request to substitute retained counsel with appointed counsel. In Mullen, there had been a total breakdown in attorney-client communications that made "an adequate defense unlikely had [the retained lawyer] handled the trial," and the defendant's request had been timely made and accompanied by a financial affidavit demonstrating eligibility for court-appointed counsel. Id. at 897. Moreover, the request to substitute counsel was Mullen's first, and the request was denied largely because the government had forgotten to take the steps necessary to arrange a hearing earlier than the first day of trial. Id. at 896-98. Under those circumstances, we held the district court had abused its discretion by not appointing a lawyer to replace the one Mullen had retained, and remanded the case for the appointment of a new lawyer and a new trial. Id. at 897-98.

Here, Hagen argues the three factors weigh in favor of our finding an abuse of discretion. We disagree. We assume without

24

deciding that Hagen's request was timely made, although we note the district court was entitled to consider the complexity of the case in deciding whether granting the request would have "obstruct[ed] orderly judicial procedure" and deprived the court of "the exercise of [its] inherent power to control the administration of justice." Id. at 895.

We next examine the adequacy of the district court's inquiry into the bases for the motion. Although the district court's questioning of Meier with respect to his trial preparations and the level of communication between him and Hagen could have been more probing, we conclude the court's extensive dialogue with the parties and counsel, considered in its totality, satisfied the court's duty to evaluate the reasons for Hagen's motion. The court also indicated that it had read and considered Hagen's motion, which set forth the factual bases for his request in great detail. See United States v. Reevey, 364 F.3d 151, 157 (4th Cir. 2004) (concluding the district court's inquiry into the basis for the motion was sufficient when the court was informed of counsels' consultations with Reevey and was assured that attorneys were ready for trial).

In addition, the district court concluded, albeit implicitly, that Hagen's request was at least in part a "transparent ploy for delay," which the Supreme Court has held is a proper basis for denying a request for change in counsel.

25

Morris v. Slappy, 461 U.S. 1, 13 (1983) (holding that the district court "could reasonably have concluded that respondent's belated requests [for change of counsel] were not made in good faith but were a transparent ploy for delay"); see also Gallop, 838 F.2d at 108 ("A request for change in counsel cannot be considered justifiable if it proceeds from a transparent plot to bring about delay."). Appointing counsel would have required delaying the trial for months, which in the court's view would have been "a travesty" not only to "th[e] court's time" but also to the "efforts that have been put into this case [by Hagen's counsel] over the last two-and-a-half years." J.A. 199-200. The court believed, and not without reason, that, even if the court were to appoint counsel and postpone the trial, Hagen was likely to file another motion shortly before the new trial date, complaining about the new lawyer's performance and "wanting another lawyer." J.A. 183.

Although the district court could have been more explicit in finding that Hagen's request was a ploy for delay, the record and the surrounding circumstances make clear that the district court so found. Hagen had been granted multiple opportunities to air his grievances about his representation in open court over the course of the year before trial. The district court, at times with the assistance of a magistrate judge, had conducted a series of extensive pre-trial hearings involving Hagen's

26

periodic complaints about Meier's representation. Moreover, the court would have been justified in taking into account (as it surely did) the nature of the charges Hagen was facing, Hagen's familiarity with the federal criminal justice system, and importantly, the fact that Hagen's aborted guilty plea negotiations had resulted in the execution by Hagen of a written plea agreement and the court's earlier ruling admitting the numerous oral admissions by Hagen of his knowing and willful participation in the "pump-and-dump" scheme at the root of the prosecution. The above circumstance no doubt accounts in large measure for the fact that the jury deliberated for less than an hour after a two-week trial. For these reasons, we conclude the district court's inquiry into the reasons for Hagen's request for appointed counsel was adequate.

In assessing the third factor, we consider whether the breakdown in communications was "so great" that it precluded the presentation of an adequate defense. Mullen, 32 F.3d at 895. Hagen focuses on the breakdown in communications that precipitated the motion for Meier's discharge, arguing there was little or no communication between him and Meier between July 2008 and February 2009. The record reveals, however, that in this period, Meier filed two pre-trial motions to suppress and responded appropriately to the government's motions in limine. Moreover, Hagen acknowledged that Meier consulted with him on

27

several occasions. Although Hagen believed other motions should have been filed, his disagreement with his attorney's trial strategies and tactics does not constitute a communication breakdown sufficient to warrant the substitution of counsel. United States v. Johnson, 114 F.3d 435, 443-44 (4th Cir. 1997).

Indeed, the court's finding that communications between Hagen and Meier were not impeding Hagen's defense was confirmed by subsequent events: by the day trial was to start, Hagen expressed that the "cooperation" between them had gone "way up," and he was "comfortable that we are now moving, at least, in a direction that I can at least communicate with [Meier and his staff]." J.A. 261. As we have explained, "A total lack of communication simply does not exist where the attorney and the client communicate significantly during trial." United States v. DeTemple, 162 F.3d 279, 288-89 (4th Cir. 1998). Accordingly, on this record, we cannot say that the lack of communication was so serious as to impact the adequacy of Meier's pre-trial preparation. For these reasons, we hold the district court did not abuse its discretion in denying the motion to discharge Meier and to replace him with a court-appointed attorney.

B.

Independent of the three-part inquiry, Hagen argues he was entitled to appointed counsel by virtue of the Criminal Justice Act itself, which provides that, "[i]f at any stage of the

28

proceedings, including an appeal, the United States magistrate judge or the court finds that the person is financially unable to pay counsel whom he had retained, it may appoint counsel as provided in subsection (b) and authorize payment as provided in subsection (d), as the interests of justice may dictate." 18 U.S.C. § 3006A(c). Hagen argues that by declining to determine whether he was "financially unable to pay counsel," the district court abused its discretion.

We disagree, because § 3006A(c) expressly incorporates a discretionary aspect into the analysis it requires. Even if a person is financially eligible for such "mid-case appointment," United States v. Rivera-Corona, 618 F.3d 976, 981 (9th Cir. 2010), the Act does not mandate that the district court appoint counsel. Rather, the district court "may" appoint counsel, and only "as the interests of justice may dictate." 18 U.S.C. § 3006A(c). Here, for the same reasons as those discussed above, the district court was entitled, within its discretion, to find that appointing counsel to represent Hagen was not dictated by "the interests of justice."

The two cases Hagen cites are unavailing. In Rivera-Corona, the district court failed to advise the defendant, who had retained a lawyer and pled guilty, that he had a right to be represented by counsel at sentencing. 618 F.3d at 977. When the defendant asked to withdraw his guilty plea and be appointed

29

counsel, the district court "summarily reject[ed]" the defendant's request for appointed counsel to replace retained counsel "simply because of the expense and the stage of the proceedings." Id. at 981. The Ninth Circuit held that "requiring a retained counsel to continue to represent the defendant even if the defendant cannot pay him and no longer wants him . . . is no substitute for appointed counsel paid with public funds and so could not, without more, be in the 'interests of justice.'" Id. at 982 (emphasis added).

The problem for Hagen is that here, there is "more," most notably indicia that the request was a ploy for delay, and evidence concerning Meier's performance as counsel. This is not a case where a judge "summarily decide[d]" that a defendant was not eligible for appointed counsel "merely because he has previously retained an attorney," or rejected a request for appointed counsel in part based on the "public expense" such an appointment would incur. Cf. id. at 978, 982. Nor is this a case, as apparently Rivera-Corona was, where a retained lawyer attempted to "influence the defendant's litigation choices by expressing an intention to seek fees from relatives or friends." Id. at 982. Rather, Meier had apparently recognized that he likely would never be paid beyond the initial retainer, but nonetheless committed (as required by widely applicable professional norms) to represent Hagen through trial, and

30

proceeded to conduct a full and vigorous defense. Those considerations, among others, render the district court's denial of his request a proper exercise of its discretion.

The other case Hagen relies upon, United States v. Parker, 439 F.3d 81 (2d Cir. 2006), is also unavailing. There, the Second Circuit considered whether the district court had erred in determining that the defendant was financially ineligible for CJA counsel. The court held the district court had made an "appropriate inquiry" into the defendant's financial eligibility, and had not clearly erred in determining that Parker had sufficient income to render him financially ineligible. Id. at 93-99. This finding made an analysis of the "interests of justice" unnecessary, because "a finding of financial eligibility is a necessary (although not sufficient) condition for mid-case appointment under the Act." Id. at 99 (emphasis added). Here, the question is a different one: whether, even assuming the defendant was financially eligible, the district court abused its discretion in finding that the appointment of counsel was not dictated by the interests of justice. The Parker court acknowledged that in some cases the answer to that question can be "no." This is such a case.

Our holding does not mean, of course, that a defendant's financial eligibility is irrelevant to whether a district court should, in the appropriate case, appoint counsel even if a

31

defendant had previously retained counsel. To the contrary: if the "interests of justice" do not weigh against mid-case appointment of counsel in a particular case at a particular time, then a defendant may request, and a district court may grant, appointment of counsel under 18 U.S.C. § 3006A(c). Moreover, the exercise of that discretion is subject to constraints. In the appropriate case, such as if there were no or few considerations weighing against mid-case appointment, or if a district court were to "summarily decide" that a defendant was not eligible for appointed counsel "merely because he has previously retained an attorney," see Rivera-Corona, 618 F.3d at 978-82, then perhaps (though we need not decide now) a district court's failure to consider a defendant's financial eligibility could constitute an abuse of discretion. In any event, it could not be clearer here that the district court did not abuse its discretion.

III.

Hagen further assigns error to the district court's denial of his motion for a continuance in order to (1) allow appointed counsel to prepare for trial or (2) allow Hagen to prepare a pro se defense. The district court's denial of a continuance is reviewed for abuse of discretion. United States v. Williams, 445 F.3d 724, 739 (4th Cir. 2006). A trial court abuses its

32

discretion when its denial of a motion for continuance is an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." Morris, 461 U.S. at 11-12 (internal quotation marks omitted). Moreover, even if a defendant demonstrates that the district court abused its discretion in denying a motion for a continuance, the defendant must show that the ruling "specifically prejudiced" his case in order to prevail. United States v. Hedgepeth, 418 F.3d 411, 419 (4th Cir. 2005).

To the extent Hagen argues a continuance was warranted for appointment of counsel, the district court did not abuse its discretion for the reasons stated above. To the extent he argues he should have been given time to prepare for his pro se representation at trial, even assuming without deciding that the district court abused its discretion, this claim fails. Prior to jury selection, Hagen agreed to allow Meier to handle the defense. Because Hagen's pro se representation at trial never came to pass, we discern no prejudice resulting from the denial of the requested continuance for additional preparation time.

IV.

We now turn to Hagen's claims of procedural sentencing error. In reviewing the district court's calculations under the Guidelines, "we review the district court's legal conclusions de

33

novo and its factual findings for clear error." United States v. Manigan, 592 F.3d 621, 626 (4th Cir. 2010) (internal quotation marks omitted).

A.

The Sentencing Guidelines provide that if a defendant is convicted of multiple counts "involving substantially the same harm," U.S.S.G. § 3D1.2, the counts "shall be grouped together," with the Guidelines range applicable to the group being the one for "the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." Id. § 3D1.3. The district court here adopted the PSR's recommendation to group the three counts of which Hagen was convicted -- conspiracy to commit securities fraud, conspiracy to commit mail and wire fraud, and conspiracy to commit money laundering. On appeal, Hagen does not challenge the decision to group the offenses. Nor does he challenge the district court's calculation of the Guidelines range for each offense, nor its conclusion that the highest offense level was on the money laundering count, for which the Guidelines recommend a life sentence. Rather, he argues that, after calculating the advisory imprisonment range for each offense, the district court erred in applying the money laundering offense level as the one applicable to the group, because Hagen's conduct "fell outside the 'heartland' of money laundering." Appellant's Br. at 26. He

34

argues the district court should have instead applied the offense level for securities fraud, which, all else equal, would have generated a Guidelines range of 324 to 405 months.

Despite the severity of the advisory imprisonment range on the money laundering count, Hagen's argument fails. The Guidelines are clear that when the advisory term of imprisonment on one count is higher than the advisory term on other counts in a "Group" the offense level for the group is the highest offense level of the counts in the Group. U.S.S.G. § 3D1.3. Prior to 2000, the Guidelines provided that "[i]f, in an atypical case, the guideline section indicated for the statute of conviction is inappropriate because of the particular conduct involved, use the guideline section most applicable to the nature of the offense conduct charged in the count of which the defendant was convicted." See United States Sentencing Commission, Guidelines Manual, Appendix A at 417, introductory cmt. (1998); see also United States v. Smith, 186 F.3d 290, 297 (3d Cir. 1999) (applying the "atypical case" analysis to grouped counts that included a money laundering count). In 2000, however, the Guidelines were amended to eliminate that analysis. See Amendment 591 ("clarify[ing]" that "the sentencing court must apply the offense guideline referenced in the Statutory Index for the statute of conviction" unless a defendant has stipulated a more serious offense). Indeed, in 2001 the Third Circuit

confirmed that the Amendment rendered the "atypical case" analysis, and therefore the test in Smith, "no longer good law." United States v. Diaz, 245 F.3d 294, 303 (3d Cir. 2001). The court continued: "[S]entencing courts may not conduct an inquiry into the heartland of § 2S1.1 and courts have no discretion to decide that the money laundering guideline is inappropriate or not the most applicable guideline on the facts of a given case." Id. Therefore, the district court correctly chose U.S.S.G. § 2S1.1 as the starting point for calculating Hagen's offense level under the Guidelines.

## B.

Hagen's next challenge to his sentence is that the district court erred in calculating the loss attributable to the conduct for which he was convicted. As stated above, the district court applied a 22-level upward adjustment to Hagen's sentence based on a finding that the loss resulting from the fraud was over $20 million.

The Guidelines instruct that for a defendant convicted of fraud, the offense level should be adjusted upward to varying degrees depending on the amount of "loss." U.S.S.G. § 2B1.1(b)(1). District courts are instructed to apply either "actual loss" or "intended loss," whichever is greater. Id. § 2B1.1, cmt. n.3(C). "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." Id.

36

§ 2B1.1, cmt. n.3(A). "Intended loss" is defined as "the pecuniary harm that was intended to result from the offense." Id. Whether using actual or intended loss, a district court "need only make a reasonable estimate of the loss." Id. § 2B1.1, cmt. n.3(C). In cases involving equity securities, the "reduction" in such securities' value "that resulted from the offense" is relevant to calculating the amount of loss. Id. Moreover, if both actual loss and intended loss "reasonably cannot be determined," then courts "shall use the gain that resulted from the offense as an alternative measure of loss." Id. § 2B1.1(b)(a), cmt. n.3(B).

The government argued at sentencing that $27.6 million, the amount the jury found constituted the "criminally derived proceeds," was a proper measure of loss for three reasons. First, it argued that GTX Global was "an essentially worthless company," and thus the entire amount investors lost from their investments in the company was caused by the fraud. J.A. 1805. Second, it argued that even if GTX was not a "worthless company" and even if other factors contributed to the drop in the value of its stock, the 22-level increase in the Guidelines applies to any losses greater than $20 million, and the evidence showed by a preponderance that at least $20 million in losses were caused by the defendants' conduct. Third, it argued that, regardless of investors' actual losses, the district court could calculate

37

loss based on "intended loss," and Hagen and his co-conspirators intended to bilk investors of between $80 million and $142 million. J.A. 1806. As evidence of "intended loss" the government relied upon an October 26, 2005, handwritten agreement between Hagen and two of his co-conspirators, Mark Brecher and Jeremy Jaynes, describing the two "phases" of the planned fraud, each 30 days long. In Phase I, they intended to sell 12 million GTX shares at $4 to $8 each, and during Phrase II they intended to sell another 4.5 million shares at $8 to $12 each. Thus, the government argued, they intended to take in between $84 million and $150 million.

Hagen disputed, and continues to dispute, each of those assertions. First he argues the company was not "worthless" and in fact had substantial assets, in the form of technology it had developed, physical infrastructure, and revenue. Second, he argues, because the company was not "worthless," the district court was required to (1) disaggregate the amount investors lost from the residual value they retained after the fraud was disclosed, and (2) to further disaggregate the amount investors lost between how much of their total loss was caused by the fraud and how much was caused by other factors. Only the amount investors actually lost, and lost because of the fraud, could constitute "the reasonably foreseeable pecuniary harm that resulted from the offense" under U.S.S.G. § 2B1.1, cmt.

38

n.3(A)(i). Hagen also argues that any reliance on "intended" loss was speculative and therefore not a "reasonable estimate of the loss." Further, he argues, the alternative of using "the gain that resulted from the offense" would be improper because the amount of loss is not such that it "reasonably cannot be determined." See id. § 2B1.1(b)(a), cmt. n.3(B). We should remand, he argues, for the district court to conduct the proper fact-finding and calculations.

Having fully reviewed the trial proceedings and sentencing hearing, we conclude the district court did not err in declining to disaggregate the amount investors lost from the residual value of their shares. The jury found that the defendants obtained proceeds of $27.6 million, and there was undisputed evidence at trial that once the fraudulent scheme was made public, the value of the shares dropped essentially to zero. The evidence thus clearly showed that investors lost the entire amount they put into the company, i.e., the proceeds from the stock sales.

As to the question whether a material portion of the investors' losses was caused by factors other than the fraud, we also conclude the district court did not clearly err. As stated, the "actual loss" for Guidelines purposes is limited to the loss that "resulted from the offense," U.S.S.G. § 2B1.1(b)(1), cmt. n.3(A), and therefore only losses caused by the fraud may be

39

attributed to Hagen for Guidelines purposes. The record amply supported the district court's conclusion that the fraud perpetrated by Hagen and his co-conspirators caused at least $20 million of the $27.6 million loss suffered by investors. Within a short period of time after the fraud was disclosed, GTX stock became essentially worthless, less than $0.01 per share. Hagen's argument that general market decline in 2006 and 2007 contributed to a substantial portion of this decrease in value is untenable on this record. Thus, the district court did not clearly err in determining that the loss caused by the defendants' fraud was at least $20 million. Having made that factual finding, the district court did not err in applying the 22-level enhancement called for by U.S.S.G. § 2B1.1(b)(1)(L), which applies to losses greater than $20 million.

The cases upon which Hagen relies do not support his argument for resentencing. In United States v. Olis, 429 F.3d 540, 545 (5th Cir. 2005), although the court vacated a sentence due to the district court's failure to exclude from the loss calculation the effects of "extrinsic factors" on the stock's decline in price, it noted that, "[i]n cases where defendants promoted worthless stock in worthless companies," a district court would properly calculate the amount of loss caused by a fraudulent scheme as "the entire amount raised by the schemes." Id. at 546-48. Here, the district court did not clearly err in

40

determining that GTX was a "worthless compan[y]" at the time the defendants sold GTX stock to investors, and therefore at least $20 million of the funds raised by the schemes constitute the loss caused by the fraud.

Similarly, in United States v. Rutkoske, 506 F.3d 170 (2d Cir. 2007), unlike here, there was no suggestion that the defendant "'promoted worthless stock in worthless companies,' which would [have] justif[ied] attributing the entire loss amount to Rutkosky's fraud." Id. at 180 n.4 (quoting Olis, 429 F.3d at 546). Moreover, the court observed that "cases might arise where share price drops so quickly and so extensively immediately upon disclosure of a fraud that the difference between pre- and post-disclosure share prices is a reasonable estimate of loss caused by the fraud." Id. at 179. This is such a case, for the reasons explained above. And while the court observed that even in such cases "a coincidentally precipitous decline in shares of comparable companies would merit consideration," id., here the evidence supported the district court's finding that the amount of loss caused by the fraud was at least $20 million, the threshold for the 22-level enhancement. See United States v. Ebbers, 458 F.3d 110, 128 (2d Cir. 2006) (affirming former WorldCom CEO's sentence for securities fraud because, even if some portion of the loss may have been caused by factors other than the fraud, "no reasonable

41

calculation of loss to investors" would have brought the loss amount below the $100 million threshold for the 26-level enhancement that applied).

For these reasons, the district court's determination of the actual loss caused by the fraud and attributable to Hagen was not clearly erroneous, and therefore supported the district court's application of a 22-level upward adjustment of Hagen's offense level.[7]

V.

For the reasons set forth in this opinion, the judgment is

AFFIRMED.

---

[7] Because the actual loss supported the district court's application of the 22-level adjustment, we need not address the government's alternative arguments that the sentence was supported by the "intended loss" and/or by the "gain that resulted from the offense."